UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>CARL D. WELLS,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Petitioner,</td><td>:</td><td>25-cv-05651 (LJL)</td></tr>
<tr><td>-v-</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>OPINION AND ORDER</td></tr>
<tr><td>SUPT. M. KING,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Respondent.</td><td>:</td><td></td></tr>
</table>

------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED: 04/28/2026           │
└─────────────────────────────────┘
```

LEWIS J. LIMAN, United States District Judge:

Carl Wells ("Wells" or "Petitioner") petitions for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, releasing him from state custody (the "Petition"). Dkt. No. 1. Superintendent King ("King" or "Respondent") opposes the Petition. Dkt. No. 30. For the reasons that follow, the Petition is denied.

## BACKGROUND

On the week of December 3, 2006, three people in Manhattan were the subject of car theft.[1] The first, Rena Welikson ("Welikson"), parked her car on the Upper West Side on December 3, 2006, and a man approached her, saying, "give me the keys and get out of the car." Trial Tr. at 798–99.[2] After she exited the car, the man told her that he had a gun and was going to shoot her unless she gave him her keys. *Id.* at 799, 801. She then gave him the keys, and he

---

[1] The following facts are taken from the state trial court's record of proceedings. In view of Wells' conviction, the Court summarizes the evidence presented at trial in the light most favorable to the verdict. *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

[2] Citations to "Trial Tr." refer to the transcript of Petitioner's trial, following voir dire, from January 15, 2019 to February 1, 2019. *See* Dkt. Nos. 30-31–30-37. Citations to "H." refer to the transcript of pretrial hearings from January 3, 2019 to January 11, 2019. *See* Dkt. Nos. 30-26–30-28.

drove off with her car. *Id.* at 802. The next day, on December 4, 2006, a man walked up to a stopped car on the Upper West Side, displayed what appeared to be a silver revolver, and told the driver of the car, Carlos Goncalves ("Goncalves"), to give him the car or else he would "explode" his head. *Id.* at 754–55. Goncalves left the car and gave the man the keys, and the man drove off. *Id.* at 758–59. Three days later, on December 7, 2006, Arelis Cuevas ("Cuevas") was driving slowly, looking for a parking spot in Washington Heights, when a man suddenly opened her driver side door. *Id.* at 209–210. He told her "Get out of the car or I will blow up your head," and she responded that he could have the car and exited the vehicle. *Id.* at 210. The man then drove off with her car. *Id.* Hours later, shortly after midnight on December 8, 2006, police officers responded to reports of a car accident in the Bronx and found Cuevas's car stopped facing north on a southbound-only street, up on the sidewalk and wedged against a fence. *Id.* at 1024, 1027–28. The responding officer found Wells asleep and slumped over the steering wheel of the car, with the smell of alcohol on his breath. *Id.* at 1024–29, 1031.

## I.    2011 Conviction, Appeal, and Remand

Wells was arrested on December 8, 2006, on charges of driving under the influence. *Id.* at 1024–29. The arresting officer learned that the car Petitioner was found in had been reported stolen by Cuevas, *id.* at 1076–77, and Wells was transferred to the 33rd Precinct in Manhattan, which had been investigating the car robbery, *id.* at 244–45, 253–54. During interrogation at the precinct, Petitioner made statements that implicated him in the other robberies involving stolen cars in Manhattan. SR 1336–37, 1343 (statements).[3] The Bronx District Attorney's Office agreed to defer prosecution on the charge of the possession of stolen property in Bronx County to the District Attorney's Office for New York County.

---

[3] Citations to "SR" refer to the State Court Record. *See* Dkt. Nos. 30-2–30-25.

On December 22, 2006, Wells was indicted by a grand jury in New York County on charges of Robbery in the First Degree in violation of N.Y. Penal Law § 160.15(4) and Robbery in the Second Degree in violation of N.Y. Penal Law § 160.10(3), in connection with the carjacking of Cuevas on December 7, 2006.  SR 0001–0002, 1804, 1925.  On January 24, 2007, Wells was indicted by a grand jury on two counts of Robbery in the First Degree and two counts of Robbery in the Second Degree, pertaining to the two other robberies, the robberies of Welikson and Goncalves on December 3 and 4, 2006.  *Id.* 0002–0006.  On the People's motion, the indictments were consolidated for trial.  *Id.* 0021–0024.

Wells moved to represent himself in these criminal proceedings and was permitted to proceed *pro se*.  *See* SR 0282.  During a suppression hearing on October 17, 2008, he questioned Manhattan Assistant District Attorney Michael Fistel ("Fistel") regarding the decision from Bronx District Attorney's office to defer prosecution to the Manhattan District Attorney and not pursue a charge for possession of stolen property in regard to Cuevas's car.  *Id.* at 0282–85. Wells subsequently moved for the appointment of a special district attorney on December 4, 2008, arguing that the coordination between the offices constituted prosecutorial misconduct and his arrest in the Bronx was a sham.  *Id.* at 0411.  The court denied the request.  *Id.* at 0411–0416. Following the court's denial of Wells's suppression motions and other motions, on February 14, 2011, Wells (still representing himself) pleaded guilty in New York County Supreme Court to two counts of robbery in the second degree.  *Id.* at 0417–59.  He was sentenced on March 9, 2011, as a persistent felony offender to two concurrent indeterminate terms of twenty years to life.  *People v. Wells*, 14 N.Y.S.3d 6, 7 (1st Dep't), *lv. denied*, 42 N.E.3d 222 (2015).

On July 7, 2015, however, the Appellate Division, First Department reversed Wells' conviction on the basis that his waiver of the right to counsel was invalid because the court had

not evaluated his competency to waive counsel or sufficiently advised him of the risks of proceeding *pro se*. *Id.* It remanded the matter to New York County Supreme Court for further proceedings. *Id.*; *see* SR 0797.

Following the appeal, Wells was transferred from the custody of the New York Department of Correction and Community Supervision ("DOCCS") to the custody of New York City's Department of Correction ("DOC") and held at Rikers Island pending a new trial. SR 0797–98.

## II.    Pre-trial proceedings & Jury Selection

Petitioner filed a number of *pro se* motions in preparation for his new trial, in addition to the motions filed by his counsel. The Court will address those relevant to Petitioner's claims.

### A.    Motion to proceed *pro se*

Petitioner made an application to proceed *pro se* on January 29, 2016 before Justice Jill Konviser of New York County, Supreme Court. Justice Konviser engaged in a *Faretta* colloquy, pursuant to *Faretta v. California*, 422 U.S. 806 (1975), with Petitioner. SR 0800–26. As part of the colloquy, the court asked Petitioner to describe the tasks he would have to undertake at trial. Petitioner noted that he would make "opening statements, . . . call your witnesses, you present, you cross-examine your witnesses" and noted "the witness list thing, calling witnesses, or making any requests for witnesses, stuff like that co counsel can assist me with that because you know, every, from what I understand, a lot of trial lawyers have the staff and some of them are good at speaking to jurors and picking jurors and some are good at cross-examining witnesses and handling trial and ending trial. Some of the paperwork, as far as witness list and stuff like that, I might be able, need a little bit of assistance like." *Id.* at 0812. The court then clarified, "You mean like to have an aide, an assistant?" to which Petitioner responded "Yes, calling witnesses, what witnesses would you like to call Mr. Wells." *Id.* at 0812. At a later point in the

4

colloquy, after the court expressed reservations regarding Petitioner's answers, Petitioner stated: "I know how to do, I know how to pick a jury, I mean with the help of Miss Messina [defense counsel], I mean with the advice I know how to cross-examine witnesses." *Id.* at 0817.

As the court asked Petitioner about his understanding of the tasks he would undertake at trial, Petitioner repeatedly returned to discussing pre-trial motions. In one instance, the court clarified "I'm not talking motion practice. I'm not. What I'm telling you is at the time this case goes to trial, all the motions will have been decided and once we get to the trial stage and we pick our jury and the case starts, the motions are finished. I'm talking about the trial." *Id.* at 0815. Petitioner responded that "whether it's by you or the Appellate Division [] this case will not proceed to trial," and proceeded to discuss his belief that the court may have to assign a special attorney for the case. *Id.* After the court again tried to redirect Petitioner's focus to trial, Petitioner stated "if I would not have represented myself [for his 2011 plea] . . . I would not be sitting here in front of you." *Id.* at 0819. The court stated, "Oh, I see what you're saying is you want to make sure you're pro se in this case and then if you get convicted you're going to get another reversal maybe?" *Id.* at 0820. Petitioner responded, "No. I'm telling you this time that I'm going to litigate this case to a dead end" and reasserted "[t]his will never make it to trial." *Id.* at 0819. Petitioner then proceeded to discuss his belief that prosecutorial misconduct made his arrest unlawful. *Id.* at 0821–824.

The court ultimately concluded "I am not prepared at this moment to grant your application. I will review this with you. I will do everything I can to let you go pro se, if that's what you want to do. I cannot do it at this moment." *Id*. at 0826. The court adjourned for another conference date, advised Petitioner to speak with counsel, and noted "we'll have this conversation again because I know it's important to you." *Id.* at 0826.

Following this conference, on February 5, 2016, Petitioner filed a petition under N.Y. Civil Practice Law and Rules ("C.P.L.R.") Article 78 ("Article 78 petition") challenging the conduct of Justice Konviser. *Id.* at 0835–40. Justice Konviser adjourned Petitioner's criminal case pending resolution of the Article 78 petition, later explaining that "[a]s a matter of law, there's nothing I can do with an Article 78 pending." *Id.* at 0861; *see also id.* 0842, 0849, 0850 (adjourning conferences pending resolution of the Article 78 petition). On December 13, 2016, following the Court of Appeals' decision declining to review Petitioner's Article 78 petition, the criminal proceedings recommenced and Justice Konviser addressed the question as to Petitioner's motion to proceed *pro se*. *Id.* at 0863. She stated that she "denied it based on the fact that [Petitioner] didn't answer [her] questions and [Petitioner] didn't leave [her] comfortable with the sense that [he] could handle this." *Id.* She advised Petitioner that "[i]f you want to make that application again, you can, and I'll hear you." *Id.* Petitioner did not then renew his motion to represent himself. He did not renew such motion until the first day of jury selection for trial. H. 492.

**B.      Motions to dismiss the indictment for violation of right to speedy trial**

Petitioner moved to dismiss the indictment for violation of his right to a speedy trial on two occasions during the pretrial proceedings. In the first motion, on June 8, 2017, Petitioner's counsel moved to dismiss the indictments pursuant to violations of New York's Criminal Procedure Law ("C.P.L.") § 30.30, New York's speedy trial law, and Petitioner's constitutional right to a speedy trial. SR 0865. In support of the motion under Section 30.30, counsel argued that the motions Petitioner filed *pro se* did not have an impact on proceedings and were not adopted by counsel, and thus should not result in excludable time excusing the State's delay, and that there are no "exceptional circumstances" excusing the State for not being ready for trial almost two years following remand. *Id.* at 0872–74. Counsel additionally argued that the

6

excessive delay warranted dismissal under the Sixth Amendment. *Id.* at 0874–0881. At the conference on September 25, 2017, Justice Kevin McGrath, then presiding, denied Petitioner's speedy trial motion, holding that the time for the pending Article 78 petition was not chargeable to the State and that after reviewing the standards, there was no constitutional violation. *Id.* at 0932–33.

On April 16, 2018, Petitioner, through counsel, moved to reargue the denial of his June 8, 2017 motion for dismissal. *Id.* at 0942. On August 2, 2018, the court affirmed the prior ruling denying dismissal in a written decision, again holding that the time pending decision on the Article 78 petition was not chargeable to the State under Section 30.30 and concluding that "while the period of time from Defendant's arrest has been lengthy, the vast majority of that delay is attributable to the Defendant, rather than the prosecution or the court." *Id.* at 0946.

On October 4, 2018, Petitioner, through counsel, again moved to dismiss the indictment on speedy trial grounds. *Id.* at 0970–0973. The court denied the motion on October 17, 2018, finding that much of the delay was attributable to Petitioner. Petitioner's counsel had only provided reports of the defense's expert witnesses in July of 2018, approximately a year after first notifying the State that the defense would call experts, and at the time of the decision, there were still-outstanding documents in regard to Petitioner's psychiatric defense that had not been provided to the State. *Id.* at 1142–1156.

### C.    *Sandoval* **Hearing**

On January 7, 2019, the trial court, with Justice Daniel Conviser presiding, held a so-called *Sandoval* hearing pursuant to *People v. Sandoval*, 314 N.E.2d 413 (N.Y. 1974), to determine which prior convictions or bad acts the prosecution could use in cross-examining Petitioner should he choose to testify at trial. H. 334. Petitioner had three prior Michigan theft-related convictions from 1982, 1983, and 1987. He also had two prior New York theft-related

misdemeanors from 1989, one of which involved a stolen car, a second-degree robbery conviction from 1990 and a first-degree robbery conviction from 1992, both of which involved gunpoint carjackings. *Id.* at 337–338. The court determined that the State would be "permitted to inquire as to whether the defendant has previously been convicted of two felonies and two misdemeanors without disclosing the crimes of conviction, the underlying facts or any of the . . . information about the types of convictions that he was subjected to." *Id.* at 352. The court held that the State would not be permitted to inquire about the Michigan convictions, as they were "too remote." *Id.*

In its *Sandoval* decision, the court stated that at a later point, he would talk to Petitioner "about opening the door and why it's not necessarily a good idea for him to do that." *Id.* at 353. Prior to empaneling the jury on January 11, 2019, the court did so, telling Petitioner that "there's a concept 'opening the door.'" *Id.* at 827. He explained, "if you get up there and you start talking about something, then the prosecutor has the right to talk about the same subject and explore it. So if you get up there and you start saying . . . all the reasons for the delay [from the 2006 and 2007 indictments to 2019 trial], you might create a situation where she can then say to you, Mr. Wells, didn't you in 2011, didn't you admit in a court that you committed this crime." *Id.* at 827. Petitioner responded, "Of course. I would not even dispute that," *id.*, and the court advised him against opening the door to a discussion of his prior plea, *id.* at 827–28. The court further explained that the jury's job is "to decide whether you committed these crimes, not whether you were treated badly by the D.A. . . . they're not here to decide whether you did too much time, that's not their job." *Id.* at 830–31.

**D.      Petitioner's renewed motion to proceed *pro se***

Upon the completion of pretrial hearings, jury selection for Petitioner's trial began on January 9, 2019. In the midst of jury selection, when prospective jurors were out of the

courtroom, Petitioner made a renewed motion to represent himself. *Id.* at 492. He stated, "Considering the fact that—and this is kind of complicated, but Ms. Messina's a professional lawyer and she's good with witnesses, she's good with picking juries and everything. At the end of the day there's one thing that I don't feel that she understands and that is—that's the other side of trial, dealing with the illegality of the arrest." *Id.* After brief discussion wherein the court advised Petitioner that defense counsel is "exercising professional judgment because she understands what matters in the trial," Petitioner reiterated his desire to raise his arrest at trial and stated "I would like to go pro se and I would like to cross examine the officers." *Id.* at 493. The court clarified, "You want to go pro se for the entire trial? In other words, you want to do everything that Ms. Messina would have done?" *Id.* Petitioner responded that he is just "asking to cross-examine the arresting officers" and affirmed that he would like defense counsel to do everything else. *Id.* at 494. The court then denied the motion as untimely, as a request to engage in hybrid representation, and as a tactic to delay the trial or create an issue for appeal. *Id.* at 494–96. The court additionally stated that though Petitioner was competent to stand trial, it did not "believe that [he was] in a position to knowingly and voluntarily waive [his] right to counsel." *Id.* at 496–97.

### III.    Trial

Trial before Justice Daniel Conviser commenced on January 9, 2019 with jury selection. *Id.* at 434. The jury was empaneled and opening statements began on January 15, 2019. Trial Tr. 1. At trial, the State presented evidence pertaining to three charged robberies, each of which involved robberies of cars in Upper Manhattan. The State presented evidence that on December 3, 2006, Petitioner forcibly stole a car from Welikson, on December 4, 2006, Petitioner forcibly stole a car from Goncalves, and on December 7, 2006, Petitioner forcibly stole a car from Cuevas. The State presented the testimony of all three complainants, the arresting officer,

9

investigating detectives, and expert witnesses in forensic science.  The State further submitted as exhibits written statements from Petitioner and his arrest photo.  SR 1336–1348.

Petitioner testified in his own defense.  The defense also offered the expert testimony of Dr. Eric Goldsmith ("Goldsmith") as an expert in forensic psychiatry and Dr. Daniel Capruso ("Capruso") as an expert in clinical neuropsychology.

The Court provides a summary of the evidence as relevant to Petitioner's claims.

### E.    Testimony of the Complainants

#### 1.    Rena Welikson

Welikson testified that on December 3, 2006, as she parked her car on West 87th Street, a man approached her and said "give me the keys and get out of the car."  Trial Tr. at 798–99. After she exited the car but before she handed the man the keys, the man told her that he had a gun and that he was going to shoot her.  *Id.* at 799, 801.  She testified that she did not see a gun, but believed he had one.  *Id.* at 800.  After relinquishing the keys, Welikson went to a nearby deli on the corner and called 911.  *Id.* at 802.  She testified that the police later contacted her to identify the man at a line-up on January 9, 2007 but she "wasn't sure at the time" she viewed the line-up and did not recall whether she identified anyone at the line-up.  *Id.* at 806.  She further testified that she would not recognize the man who robbed her if she saw him today.  *Id.* at 807.

#### 2.    Carlos Goncalves

Goncalves testified that on December 4, 2006, while working as a driver for Stephen Cooper ("Cooper"), he drove Cooper to the intersection of 88th Street and Lexington Avenue. Cooper entered a bicycle store and while Goncalves waited in the car, a man opened the driver's side door and told him "get out of the car now because if you don't I am going to explode your head."  *Id.* at 754–55.  Goncalves testified that the man opened his jacket and showed him a big silver revolver, and then pointed it at his head.  *Id.* at 755.  Goncalves told him "take it easy" and

10

got out of the car, after which the man entered the car and drove away. *Id.* at 758–59. Goncalves then entered the store and told Cooper what happened, and Cooper called 911. *Id.* at 761–62. Goncalves testified that he viewed a line up ten days later and confirmed that he was able to quickly identify the man, within approximately five seconds. *Id.* at 763–64. Goncalves, however, was not able to identify Petitioner at trial. *Id.* at 765. On cross examination, Goncalves testified that he had started treatment for a vision problem in 2006, had cataracts removed prior to the incident, and was diagnosed with glaucoma following the surgery. *Id.* at 775–76.

The State also presented the testimony of Cooper, who testified that Goncalves had driven him to a bicycle store that day and entered the store, visibly distressed, stating that someone had taken the car. *Id.* at 721–24. Cooper testified that he then called 911, reported that someone had car-jacked the car, and gave them the address. *Id.* at 724.

### 3.    Arelis Cuevas

Cuevas testified that on December 7, 2006, she was driving slowly, looking for a parking space, when a man opened the driver-side door of her car and said, "Get out of the car or I will blow up your head." *Id.* at 209–210. She responded, "This is what you want? This car? You can have it." *Id.* at 209. The man then took the car and drove off. *Id.* She stated that he had his hand under his shirt, pointing towards her, and she believed he had a gun. *Id.* at 211. She then walked to a person in a nearby van and used his phone to call 911. *Id.* at 212. The police arrived at the scene and she made a report of the stolen car. *Id.* at 215. That evening, around 1:00 a.m., the police called her and stated that they had found her car. *Id.* at 215–16. She met Detective Pizarro on December 8, 2006 at the 33rd precinct and gave him a description of the man who robbed her. *Id.* at 216. She testified that when her car was returned to her it had been damaged on one side and on the front, and there were things, like clothes and a bottle of liquor, that were

11

not hers inside the vehicle.  *Id.* at 224.  Cuevas positively identified Petitioner, sitting in the courtroom, as the man who stole her car.  *Id.* at 223.

### F.     Petitioner's Statements and Line-Up Identification

The State also offered the testimony of Detective Pizzaro and Detective Werner, both of whom interrogated Petitioner after his arrest in the Bronx on December 8, 2006 and took down written statements.  Detective Werner further offered testimony that during lineups, both Welikson and Goncalves identified the Petitioner as the man who had stolen their respective cars.

The State offered testimony that Petitioner confessed to all three robberies.  Detective Pizzaro testified that he was assigned to investigate the theft of Cuevas's car, *id.* at 244, and, on December 8, 2006, in the midst of that investigation, was informed that Petitioner had been found in the stolen car and was in custody in the Bronx, *id.* 249.  *See also id.* at 1076 (arresting officer testifying that during her arrest processing of Petitioner she learned that the vehicle he was found in had been reported stolen).  Pizzaro testified that he brought Petitioner into an interrogation room and read him his *Miranda* rights.  After Petitioner waived his *Miranda* rights, Petitioner made a statement which Pizzaro recorded and Petitioner signed.  *Id.* at 254–263.  The statement, which was entered into evidence, read in full:

> I'm sure that I have taken this car that I was found in.  I apologize to the person that I took the car from.  I'm on drugs and I have been up for days without sleep.  Whatever details about events related to taking this car I admit to.  Yet I can't remember all the details myself.  I need medical help.

*Id.* at 265–66 (Detective Pizzaro reading statement); SR 1343 (signed statement).  Pizzaro then arrested Petitioner for the robbery of Cuevas's car.  Trial Tr. 267.

Retired Detective Werner also testified.  *Id.* at 56.  He participated in the investigation of both the Welikson robbery and the Goncalves robbery as part of the Manhattan Robbery Squad,

which investigates pattern robberies. *Id.* at 56, 59. Detective Werner also interrogated Petitioner

on December 8, 2006, after Petitioner again waived his *Miranda* rights. *Id.* at 64–74. Petitioner

provided a signed statement, which Werner read into evidence:

> On 12-4-06, I took a black Mercedes. I walked up to the driver near 86th Street and told him to get the fuck out of the car. I don't remember what I said because I was drinking Bacardi.
>
> At some point the tire went flat and I paid someone to change it. I asked a guy walking down the street near 123rd Street, I purchased my Bacardi at a liquor store at 123rd and Lex, and I was using heavy amounts of cocaine.
>
> If I needed money, I would grab anything I could get. I would grab purses from women. I would get out of the car and just grab it.
>
> I parked the car near 123rd and Lex. When I went back to the car, it was gone. I threw the keys for the car way. I left the black bag on the front passenger floor that had my personal items in it. (slippers, toiletries).
>
> When I took the purse, I would go through it for cash and throw the rest away. When I would steal a car, I would park it somewhere, then I would forget where I parked it. Then I would go steal another one.
>
> On one occasion, a white blonde-haired female was in the car with me when I did a robbery. This was in Midtown. I don't remember her name, but she was about forty-three years old.
>
> I would sleep in the cars. If I left the car, it was to get drugs. Then I would come back to the car. The blond girl took some of the items from the pocketbooks I stole. She kept a camera. I met her near 124th Street around 4 a.m. in the morning.
>
> I cannot remember specifically what I was doing, but I did a lot. I got out of jail on November 2, 2006, and about three or four days later I started drinking and doing drugs. I just got in a car and drove off. I jumped in at a gas station. No one in the car. I did not say anything to the people. There was a box of jewelry in the front seat. I had a thick gold chain around my neck and several bracelets in my jacket pocket. I sold a couple of gold chains for $200 on the street to some unknown male black. There was approximately $20,000 in jewelry inside the box.
>
> Sunday, December 3, 2006, 8 a.m., I went to work at Fridays, 46th and Broadway. When I got there, decided to quit. I left Fridays and bought a bottle of tequila. I jumped on the train and drank the tequila. I took the tequila from my job. On Sunday, I remember taking a car, but I parked it and couldn't find it. I don't remember what kind of car, but it was gray. I left some clothes in my locker at Fridays. I thought that someone was chasing me, so I changed my white pants and shirt uniform from Fridays, and I left my clothes in my locker. I left a black leather

13

jacket, sweater, jeans, and boots. I then grabbed a bottle of tequila from behind the bar and left Fridays.

Before I got to work, I came upon a car that was running. There was no one in the vehicle. When I jumped in the car, it shut off. A man came over to me and began to yell at me. I then jumped out of the passenger side. I ran down the street. This happened near the 50's.

All this happened when I was under the influence of alcohol and drugs. I can't remember what I did, but there was a lot of things that I did to support my drug and alcohol habit.

Trial Tr. 75–77; SR 1336–37 (signed statement).

Detective Werner also testified as to the line-up identification procedures that he conducted on December 14, 2006 and January 9, 2007. At those line-ups, both Goncalves and Welikson, respectively, identified Petitioner as the man who robbed them. Trial Tr. 79–96.

Detective Werner also testified that on January 9, 2007, when driving Petitioner from the precinct, where the line-up was conducted, back to his place of residence, Petitioner "basically said he was guilty of all the crimes he was accused of and he wanted to plea guilty to them but he didn't—his lawyer said not to." *Id.* at 98–99. Detective Werner testified that he told Petitioner to stop talking and to speak with his lawyer, and Petitioner responded that he wanted to represent himself and admit to all of the crimes he had committed. *Id.* at 99.

### G.    DNA and Handprint Evidence

The State offered DNA evidence and handprint evidence linking Petitioner to the car stolen from Goncalves on December 4. The State offered the expert testimony of Criminalist Kecia Harris ("Harris") from the Office of the Chief Medical Examiner ("OCME"), *id.* at 883, that Petitioner's DNA was found on sunglasses, a straw, and a soda bottle located in Goncalves's car, *id.* at 918–19. Harris testified that she analyzed DNA profiles generated from the recovered evidence and the buccal swab from Petitioner and that the profiles matched. *Id.* at 917, 943.

14

The State also called Detective Arthur Connolly ("Connolly") as an expert witness qualified in latent print examination and comparison, who testified that a latent print recovered from Goncalves's car matched Petitioner's handprint. *Id.* at 596. Connolly testified that to reach this conclusion, he analyzed latent prints that were recovered from the car in the Goncalves robbery, *id.* at 993, and identified two that were "of value," meaning they had "sufficient amount of ridge detail to identify someone or exclude," *id.* at 994. After comparing the known prints for Petitioner and the two latent prints, he determined that while one of them was inconclusive, the other matched Petitioner's prints. *Id.* at 997, 1000. In other words, the prints were "the same" and "came from the same source, the left palm . . . from Carl Wells." *Id.* at 999. Defense counsel then cross-examined Connolly regarding the subjective review of latent print examinations, who testified that the analysis is conducted through "tedious" study of the ridges with a magnifying glass and toothpicks. *Id.* at 1011; *see generally id.* at 1001–15.

### H.    Petitioner's Testimony

After the prosecution rested, Petitioner chose to take the stand and testify in his own defense. Prior to Petitioner's testimony, the court advised him of two things. First, it noted Petitioner's concerns about missing files, missing evidence, and what he characterized as prosecutorial misconduct, but advised him that legal arguments are not a proper subject for his testimony before the jury. *Id.* at 1050–51. Second, the court noted that, through the *Sandoval* ruling, it limited the State's ability to inquire about his criminal history, but that if Petitioner started testifying about his prior convictions, the State would be allowed to ask further questions. *Id.* at 1053. Justice Conviser explained that the principle is "opening the door" which he described as "sort of a colloquially way of saying, if I protect you by limiting the People's inquiry about your prior criminal history, you start talking about it anyway the People are allowed to ask you questions about it. The protection I've given you no longer applies." *Id.*

15

Additionally, in order to minimize prejudice to Petitioner, the court instructed him to sit at the witness stand prior to the jury entering the courtroom, so that they would not see the officers escorting him to the witness stand. *Id.* at 1114–15. Upon request from defense counsel, the court further agreed to instruct the jury that the presence of court officers—one standing behind the defendant, one standing near the door about ten feet away from the defendant, and one standing in the corner of the courtroom—is standard courtroom procedure for when defendants testify. *Id.* at 1116–17; *see id.* at 1117 (court instructing the jury "this is just standard procedure we use when a defendant testifies; don't assign any significance to that").

Petitioner then testified as to his upbringing in Michigan and stated that he began abusing alcohol in the late 1980's after he separated from his wife and son and moved to New York to play guitar. *Id.* at 1118–1123, 1125. He testified that he later started using cocaine and was diagnosed with schizoaffective disorder, bipolar disorder, and personality disorder. *Id.* at 1126. He testified that his older brothers and sisters all have mental illnesses. *Id.* at 1126–27. His counsel inquired about prior convictions, and he affirmed that he had been previously convicted of two felonies and two misdemeanors. *Id.* at 1127. He also discussed prior head injuries he had suffered. *Id.* at 1128–29.

Defense counsel then asked Petitioner about the events leading to his December 8, 2006 arrest. She asked him to describe what happened in November of 2006. *Id.* at 1129. He offered that he was released from prison in 2004 and was paroled to Michigan from New York. *Id.* at 1129–30. He stated that he "got in some trouble" for a parole violation in Michigan but was wrongfully accused and spent a whole year in the county jail before he "beat the case," after which he was sent back to New York. *Id.* at 1130. He said he was then released from custody in November 2006. *Id.* He described that he was paroled to the wrong office and had to spend a

16

night on the street due to incorrect paperwork, and he ended up in a nightclub where he started drinking again. *Id.* at 1131–32.  The next day, he got a job at a restaurant and began living at a shelter on Wards Island*.  Id*. at 1133.  He testified that he started using drugs again, but he "didn't just jump out and use a lot of drugs.  It built up." *Id.* at 1134.  He explained that he "was actually not wanting to do it at all.  But at the end of the day there was a lot of drugs" at the shelter where he was residing. *Id.* at 1134.  He had expected to be paroled to Michigan but instead he had to stay in New York so his "whole life got spun around." *Id.* at 1134.  He said he recognized that he needed help, and asked his parole officer and the people at the shelter for help. *Id.* at 1135.  He described that, even before the allegations, he thought people were chasing him. *Id.*  He explained that he was not thinking rationally at all and was drinking all the time and buying cocaine; he stated that he continued drinking because he felt like he did not have a choice. *Id.* at 1136–37.

His defense counsel then asked him about the car jackings, and he said that he "do[esn't] remember details of taking these cars from anybody . . . [he] [doesn't] remember details about statements at all, because [he] was out of it." *Id.* at 1137–38.  He testified that he doesn't remember details of waking up in the car on December 8, 2006 but remembers the 40th precinct because he kept being woken up in the holding cell by yelling and arguing. *Id.* at 1139.  He testified that he was "severely intoxicated" and "all [he] wanted was sleep." *Id.* at 1140.  He remembered traveling to the 33rd precinct and still feeling intoxicated. *Id.* at 1141.

As to his interrogation, he testified that he remembered Chinese food and soda, being in a room with a light, and "numerous officers coming at [him], one at a time, back to back, and [he] just wanted to be left alone." *Id.* at 1141.  He stated "it just never stopped, and coming at me, asking me questions, and asking me this, and asking me what I did and said." *Id.* at 1141.  He

stated that he does not think that he committed the crimes and acknowledged that he had been previously found unfit for trial in 2007, when he tried to plead guilty and they would not let him because he was unfit. *Id.* at 1142–43.

Defense counsel asked Petitioner if he had a gun during this period of time, to which he responded:

> No, my God. And look at me, I have never had a gun in New York City in my life. I don't like guns. If I had gotten a gun I probably would have sold it for money. I never had a gun in New York. I don't likes [sic] guns. So when I heard about this silver thing that was crazy. I never had a gun.

*Id.* at 1145. He testified that previously he thought he was guilty but no longer believes so; he testified "I was in the position to where my remorse was overboard [sic], and I wanted to be crucified because I thought I had done this crazy mess." *Id.* at 1146. He concluded his testimony on direct stating that he was found unfit to proceed in March 2007, and then after psychiatric treatment and medication he was found fit. *Id.* at 1147. He testified that he has not taken any medication since 2010. *Id.* at 1148.

After Petitioner's direct testimony, the court determined that "all kinds of doors have been opened." *Id.* at 1149–50. The court stated that his testimony portrayed him as a victim to the jury, "in other words, he had been victimized by the system, and he has been put in unfair positions." *Id.* at 1153. Since Petitioner discussed that he originally thought he was guilty, that he previously represented himself, and that he was found not fit and then fit, the court determined that he opened the door to his prior guilty plea. *Id.* at 1153. The court also determined that the State could discuss that he was recently found to be fit. *Id.*

The court also found that Petitioner's statement that he had never possessed a gun opened the door to questions regarding his prior conviction for first degree robbery, which included, as an element, displaying what appeared to be a firearm during a robbery. *Id.* at 1154. The court

18

acknowledged that "appears to be a firearm" is distinct from possessing a firearm, but stated that Petitioner's discussion of treatment on parole following the conviction "was completely gratuitous and unnecessary" and could cause the jury to think that "maybe he was given a raw deal," "when in reality he stood convicted of robbery in the First Degree, which is obviously a very serious crime, and explains, I think—or goes to explain why Parole treated him the way they did." *Id.* at 1158. The court also concluded that evidence that he was convicted of a crime involving the display of what appeared to be a gun is relevant to Petitioner's testimony that he never had a gun and does not like guns. *Id.* The court concluded that these two reasons, together, opened up the door to the prior conviction. *Id.* at 1159.

On cross-examination, the State questioned Wells about his decision to plead guilty and subsequent appeal. *Id.* at 1171–1186. Wells testified that he pled guilty with the intention of appealing, but that he was not guilty. *Id.* at 1171. He affirmed that he pled guilty because, at the time, he thought he was guilty and because he wanted to negotiate a lower sentence. *Id.* at 1173–75. After his defense counsel "brought all the evidence out," he no longer believed in his guilt. *Id.* at 1172. He testified that following his plea, he filed a notice of appeal and his appeal was overturned by the Appellate Division in 2015, but he was not sure precisely why the conviction was vacated. *Id.* at 1186.

The State also questioned Wells regarding his 1992 conviction, and Petitioner answered that he was innocent of the crime and wrongfully convicted. *Id.* 1186–1190. As part of the exchange, Petitioner stated "Isn't it ironic these allegations happen to be the same allegations as I'm going to blow your head off? I don't have the ability to go inside and tell the women I'm going to blow your head off. It's not me." *Id.* at 1190. Following this statement, counsel approached the bench and the court agreed that Petitioner opened the door to questions about his

19

1990 conviction, which stemmed from a grand jury indictment following the complainant's testimony to the grand jury that Wells approached a woman in her car and "stated in substance to this woman, get the fuck out of the car or I'll blow your fucking head off." *Id.* at 1191–92. Mr. Wells denied that he committed the crime but acknowledged he took a plea leading to the 1990 conviction. *Id.* at 1193–94.

## I.      Defense Expert Testimony

Following Petitioner's testimony, the defense called Goldsmith as an expert in Forensic Psychiatry to testify as to Petitioner's mental state at the time of the alleged offenses. He testified regarding the exam performed on Petitioner in March 2007 where examiners diagnosed Petitioner with psychotic disorder and substance abuse disorder. *Id.* at 1284–87. The expert testified that he interviewed Petitioner in March 2017 and determined that he had bipolar disorder. *Id.* at 1293–94. He also testified that alcohol and drug use can make the symptoms of mental illness "much more intense and worse" and lack of sleep can be "an instigator for bipolar mania." *Id.* at 1298. In sum, he explained that the combination of Petitioner's bipolar disorder, memory and learning difficulties, and intoxication through alcohol and cocaine, would create brain and behavior problems that impacted his state of mind. *Id.* at 1326–27.

On cross-examination, Goldsmith testified that from his interview with Petitioner, he found him to be an unreliable historian, which means that he provided information that seemed to be inaccurate. *Id.* at 1307. The State also inquired about the ability of people with alcohol abuse disorder and bipolar disorder to complete daily tasks; Goldsmith testified that people with those disorders could perform daily tasks, hold a job, and maintain relationships. *Id.* at 1339–40. The State further inquired about changes that had been made between the first and final drafts of Goldsmith's expert report. On redirect, defense counsel inquired about statements Petitioner made following interrogation and the expert further testified that Petitioner's "difficulty in

20

memory creates a state of confusion. And he takes actions, and makes statements, based upon information that's incorrect in his mind. And so he could talk about things that he believes occurred, where he may sincerely believe they have occurred, but that it's not correct." *Id*. at 1351.

The defense also called Capruso as an expert in clinical neuropsychology*, id*. at 1356–57, who opined that at the time of his 2006 arrest, Petitioner was suffering from a psychotic episode during which his "mental disorganization," "psychosis," and "memory loss," would have been exacerbated by his intoxication, *id*. at 1378–79. On cross-examination, Capruso admitted that he had limited familiarity with Petitioner's criminal history. *Id*. at 1403–05. He also conceded that a person with poor verbal learning and memory deficiency, such as Petitioner, would still be able to perform daily tasks and would not be incapable of goal-directed activity. *Id*. at 1412–13. He also admitted that Petitioner's reports of head trauma were supported only by earlier self-reports to medical professionals. *Id*. at 1415. In response to the State's question about Petitioner's intent, Capruso opined that in December of 2006, Petitioner was not capable of forming an intent to do "something that would require a degree—a large degree of mental organization." *Id*. at 1431–32.

### J.    Summations

Following the close of evidence, both the defense and the State presented their summations to the jury. *See id*. at 1497–1560 (Defense summation); 1563–1606 (State summation). The Court provides limited background as to the State summation only, as Petitioner only raises a claim with respect to the State's summation.

In summation, the State recounted the evidence supporting the charges as to each of the robberies involving Welikson, Goncalves, and Cuevas. At the end of the summation, the State argued:

21

> Ladies and gentlemen, the defendant's actions during each of the three robberies with which he is charged were purposeful, calculated, and intentional. The defendant's MO was as unique as his DNA, his fingerprints, and his signature. And though the car-jackings he committed are almost indistinguishable from one another, the evidence presented to you has independently proved the defendant's guilt beyond a reasonable doubt as to each individual robbery.

*Id.* at 1604. Defense counsel made a general objection at the close of the summation. *Id.* at 1606. Following a discussion of scheduling and whether Petitioner could be present in the courtroom for the jury charge, defense counsel further explained her objection to how the State closed its summation:

> One other thing, for the record, the People's summation, I am objecting after the fact, because it was kind of how they closed, they made a comparison about all three events in terms of the MO, while they were unique and distinguishable, I am concerned that the prejudice now, though there's lesser proof on one event as opposed to the others, they are now going to conclude that because of the similarity and MO's they should find him guilty on everything.

*Id.* at 1613. The court overruled the objection, stating "I think you and I have done everything possible to emphasize, to the point of beating them over the head, with the admonition they should consider each count separately." *Id.*

## IV.    Verdict & Sentencing

On February 1, 2019, the jury returned its verdict. The jury acquitted Petitioner of both charges related to the robbery of Welikson on December 3. It convicted Petitioner of the first- and second-degree robbery counts relating to Goncalves and Cuevas on December 4 and December 7, respectively. *Id.* at 1693–94. The jury also found that Petitioner had proved the affirmative defense that he did not possess a loaded and operable firearm, which reduced each count of first-degree robbery to second-degree robbery. *Id.* at 1698.

On February 26, 2019, the court held a sentencing hearing at which it adjudicated Petitioner a persistent violent felony offender pursuant to Penal Law § 70.08. SR 1304, 1307. Though his defense counsel did not move to challenge the underlying convictions, Petitioner

made a *pro se* motion challenging the use of his 1990 and 1992 convictions to establish his predicate status, arguing that his 1990 plea was for a crime that he could not have committed due to his arm injury at the time, *id*. at 1295–1298, and that his 1992 plea was not taken knowingly and voluntarily*, id*. at 1299–01. The court denied Petitioner's application, reasoning, *inter alia*, that he did not challenge the validity of the 1990 plea itself and the 1992 plea was affirmed by the Appellate Division, First Department*. Id*. at 1298–1302. Following statements from the State and defense counsel, the court sentenced Petitioner to two concurrent terms of twenty years to life*. Id*. at 1330.

## PROCEDURAL HISTORY

On January 7, 2025, the New York State Supreme Court, Appellate Division, First Department, issued an opinion affirming Wells' conviction and sentence. *People v. Wells*, 226 N.Y.S.3d 15 (1st Dep't), *lv. denied*, 261 N.E.3d 941 (2025); Dkt. No. 1 at 4–8. The court rejected Wells' argument that he was denied his right to represent himself, finding that he did not make an unequivocal request to represent himself for all purposes, that the court did not deny his request outright, and that to the extent that Wells made an unequivocal request, he abandoned that request, *id.* at 17. The court also rejected Wells' other challenges to his conviction and his sentence. It found that Wells had failed to preserve his claims that the consolidation of the indictments or the court's instructions denied him a fair trial and, as an alternative holding, rejected them on the merits. *Id.* It also concluded that any error in denying severance was harmless in light of the overwhelming evidence of Petitioner's guilt. *Id.* It further concluded that Defendant had not preserved his claim that the court's modification of its *Sandoval* ruling denied him a fair trial and that, in any event, he waived the claim by stating he wanted to tell the jury about the facts underlying his convictions and admitting to intentionally opening the door to questions. *Id.* It concluded that Defendant's challenges to the prosecutor's summation were

23

unpreserved. *Id.* at 18. It rejected Defendant's challenge to the presence of a court officer behind Petitioner, finding that the officer's presence during a limited time would not telegraph to the jury that defendant was a dangerous individual. *Id.* It rejected Wells' Confrontation Clause argument on the basis that the expert had conducted her own independent analysis of the data and was not merely a conduit for the conclusion of others. *Id.* It also rejected the challenge to his adjudication as a mandatory persistent violent felony offender. *Id.* at 19. In regard to Petitioner's *pro se* claims on appeal, the court summarily denied them as "unavailing." *Id.*

On May 28, 2025, the New York Court of Appeals denied Wells' petition for leave to appeal. *Id.* at 9.

Wells filed this petition on July 8, 2025. Dkt. No. 1.[4] On August 5, 2025, the Court issued an order directing Respondents to answer the petition. Dkt. No. 5. On January 13, 2026, Respondent responded to the Petition, filing the state court record and a memorandum of law in opposition to the Petition. Dkt. Nos. 30–31. On January 28, 2026, Petitioner filed a "traverse" in reply to the memorandum of law in opposition to the Petition. Dkt. No. 35.

## DISCUSSION

Petitioner argues in his Petition that: (1) his speedy trial rights were violated by the District Attorney's Office and the Center for Appellate Litigation when he experienced a nine-year delay between his initial conviction and 2019 trial; (2) he is actually innocent of all crimes of which he was convicted; (3) he was prejudiced due to the location of court officers in the courtroom; (4) he was denied his right to self-representation; (5) he was denied his right to challenge the constitutionality of his prior convictions at a hearing; (6) the State engaged in

---

[4] Wells previously filed a Section 2254 petition in this Court on December 28, 2021. *Wells v. Miller*, Case No. 21-cv-11231, Dkt. No. 1 (S.D.N.Y. filed Dec. 28, 2021). The Court dismissed that petition without prejudice for failure to exhaust state court remedies. *Wells v. Miller*, 2023 WL 2647891 (S.D.N.Y. Mar. 27, 2023).

prosecutorial misconduct by withholding evidence; (7) his Fourth Amendment rights were violated through his improper detention on Rikers Island; (8) the trial court improperly permitted cross-examination regarding his prior convictions; (9) the State improperly comingled evidence across the charges in its summation; and (10) the testimony from Harris, the DNA expert witness, violated the Confrontation Clause.  Dkt. No. 1.

The Court's review of Petitioner's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, which imposes numerous procedural constraints.  The first of these requirements is exhaustion.  Generally, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  *Id.* § 2254(c).  The exhaustion requirement exists to ensure that a state prisoner has given the State "the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation and internal quotation marks omitted); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").  "[W]hen a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits."  *Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006).

As to the merits of a petitioner's claims, the AEDPA provides for a deferential review of the state court's ruling. *Drake v. Portuando*, 553 F.3d 230, 239 (2d Cir. 2009). It reads, in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has "interpreted § 2254(d)(1) as giving independent meanings to the 'contrary to' and 'unreasonable application' clauses." *Overton v. Newton*, 295 F.3d 270, 275 (2d Cir. 2002) (citing *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). "A state court decision is 'contrary to' clearly established federal law as determined by the Supreme Court 'if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Id.* (citing *Williams*, 529 U.S. at 413). "A state court decision involves an 'unreasonable application' of clearly established federal law as determined by the Supreme Court when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Jones v. West*, 555 F.3d 90, 96 (2d Cir. 2009) (quoting *Williams*, 529 U.S. at 413). Such application of federal law must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). "The state court decision must be 'so lacking

26

in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *White*, 572 U.S. at 420); *see also Sorto v. Herbert*, 497 F.3d 163, 169 (2d Cir. 2007) ("[I]t is well-established in this Circuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain *habeas* relief."). The Supreme Court has held that Section 2254(d)(1) "would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law." *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004).

"A state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" *Drake*, 553 F.3d at 239 (quoting 28 U.S.C. § 2254(e)(1)). A state court's factual determination may not be deemed unreasonable "merely because [a reviewing court] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Instead, Section 2254(d)(2) requires a reviewing court to "accord the state trial court substantial deference." *Id.* at 314. Even if "[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (alterations in original) (citation omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015).

Because Petitioner proceeds *pro se*, the Court is obliged to construe his Petition and submissions liberally, *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d

27

471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citations omitted).  The Court

addresses each of Petitioner's claims in turn.

## I.  Actual Innocence

Petitioner claims that he is "[a]ctually [i]nnocent of all crimes convicted and indicted."

Dkt. No. 1 at 2.   Respondent answers that Wells' claim of actual innocence is not cognizable

and meritless.  Dkt. No. 30 ¶ 5(a).  It further argues that, to the extent Petitioner argues that his

actual innocence claim excuses his failure to exhaust other claims, such argument is meritless

because his actual innocence claim is meritless.  Dkt. No. 31 at 19.

"The Supreme Court has never recognized a freestanding claim of actual innocence.  As

the Supreme Court has explained, 'federal habeas cases have treated claims of 'actual

innocence,' not as an independent constitutional claim, but as a basis upon which a habeas

petitioner may have an independent constitutional claim considered on the merits, even though

his habeas petition would otherwise be regarded as successive or abusive.'"  *Jimenez v. Stanford*,

560 F. Supp. 3d 761, 768 (S.D.N.Y. 2021) (Nathan, J.) (quoting *Herrera v. Collins*, 506 U.S.

390, 416–17 (1993)); *accord Little v. Tynon*, 2023 WL 4303900, at *7–8 (S.D.N.Y. Jan. 27,

2023), *report and recommendation adopted*, 2023 WL 4298938 (S.D.N.Y. June 30, 2023).

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether

the impediment is a procedural bar . . . or . . . expiration of the statute of limitations."

*McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  "[T]enable actual-innocence gateway pleas are

rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district

court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him

guilty beyond a reasonable doubt.'"  *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

Even assuming that Petitioner has articulated a constitutional claim which depends on an

actual innocence claim to be cognizable, Petitioner has not demonstrated that no reasonable juror

would find him guilty beyond a reasonable doubt for either of his robbery convictions. There was powerful evidence of Petitioner's commission of both the December 4 and the December 7 robberies. Petitioner confessed to the December 4 robbery of Goncalves, he was identified by Goncalves shortly after the robbery, and DNA evidence and latent print evidence tied him to the stolen car. Petitioner also confessed to the robbery of Cuevas and theft of her car on December 7, he was identified in court by Cuevas, and he was found in the stolen car on December 8. Petitioner has presented no new evidence that would support a claim of actual innocence as to either conviction or spur doubt as to the State's evidence. Petitioner's claim of actual innocence is therefore denied.

## II.    Speedy Trial

Petitioner claims that he was denied his right to a speedy trial due to the eight-year delay between his 2011 conviction, which was vacated in 2015 following a direct appeal, and his trial in 2019. Dkt. No. 1 at 2. Respondent argues that Wells's claim of appellate delay from 2011 through 2015 is non-cognizable and meritless, and that his speedy trial claim for delay from 2015 to 2019 is meritless. Dkt. No. 30 ¶ 5(b).

Petitioner's claim that appellate delay violated his constitutional right to a speedy trial is meritless.[5] Even assuming Petitioner can raise a challenge to the speed of his prior appeal on a

---

[5] Respondent also argues that, even though he raised it in his *pro se* brief on direct appeal, Petitioner's claim in regard to appellate delay is unexhausted, because he retains the right under New York law to raise a claim of ineffective assistance of appellate counsel through a coram nobis petition. Dkt. No. 31 at 22 (citing *Fernandez v. Artuz*, 402 F.3d 111, 115–16 (2d Cir. 2005) ("[T]here is no deadline at all for filing coram nobis petitions")); *see Brightley v. Heath*, 2015 WL 10487766, at *21 (S.D.N.Y. Jan. 6, 2015), *report and recommendation adopted*, 2016 WL 1060326 (S.D.N.Y. Mar. 15, 2016) (finding claim that appellate counsel's delay violated habeas petitioner's due process rights unexhausted because petitioner failed to demonstrate that he sought leave to appeal from trial court's denial of the claim in his underlying coram nobis application). However, the Second Circuit has not always required the filing of a coram nobis petition to exhaust a claim. *See Roberites v. Colly,* 546 F. App'x 17, 20 (2d Cir. 2013) (summary order) ("We have previously rejected arguments that such due process claims must be first

subsequent appeal, Petitioner has not established that the Appellate Division's decision to deny

the claim was contrary to clearly established law.  The Second Circuit has interpreted the speedy

trial clause of the Sixth Amendment to "afford criminal defendants the right to a timely *appeal*,

and well as to a timely trial."  *Brightley v. Heath*, 2015 WL 10487766, at *29 (S.D.N.Y. Jan. 6,

2015), *report and recommendation adopted*, 2016 WL 1060326 (S.D.N.Y. Mar. 15, 2016)

(emphasis in original) (citing *Cody v. Henderson*, 936 F.2d 715, 719 (2d Cir. 1991) and *Mathis v.

Hood*, 937 F.2d 790, 794 (2d Cir. 1991)).  However, in finding a right to a timely appeal, the

Second Circuit specifically recognized that "[t]he Supreme Court has not yet directly addressed

the issue of whether the Constitution guarantees a speedy criminal appeal, once an opportunity

for an appeal is provided."  *Cody*, 936 F.2d at 718.  A habeas petition must be based on a

violation of federal law as established by the Supreme Court—the law as stated solely by a

Circuit, no matter how well established within that Circuit, cannot form the basis of a habeas

petition.  *See Smith v. Wenderlich*, 826 F.3d 641, 649 (2d Cir. 2016) ("To the extent that a

federal habeas petitioner relies . . . on decisions of any other court which are not reflected in a

holding of the Supreme Court, such decisions are not a permissible basis for the granting of the

writ."); *Mancha v. Dep't Superintendent*, 2023 WL 8788909, at *7 n.8 (E.D.N.Y. Dec. 19, 2023)

("Second Circuit precedent cannot, by itself, be the basis for granting a habeas petition, in light

of AEDPA's focus on clearly established Supreme Court precedent").  "When there is no

Supreme Court holding on a given issue, 'it cannot be said that the state court unreasonabl[y]

appli[ed] clearly established Federal law' within the meaning of AEDPA."  *Smith*, 826 F.3d at

649 (quoting *Carey v. Musladin*, 549 U.S. 70, 74 (2006)).  As when *Cody* was decided, there

---

pursued in state court, deeming writs of error coram nobis inadequate to afford relief.").  In any
event, Petitioner's claim of appellate delay in regard to his prior direct appeal is meritless.

remains no Supreme Court precedent clearly extending the right to a speedy trial under the Sixth Amendment to incorporate a right to a speedy appeal.  The Appellate Division's decision thus did not contradict clearly established federal law.[6]

Petitioner additionally claims that the more than three-year delay between the Appellate Division's decision to vacate his conviction in 2015 and the start of his trial in 2019 violated his constitutional right to speedy trial.  Dkt. No. 1 at 2.  Petitioner raised this claim in his *pro se* brief in support of his direct appeal and the Appellate Division summarily denied the claim.  *Wells*, 226 N.Y.S.3d at 19.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  "The right to a speedy trial protects the accused's interest in 'decent and fair procedures' and the public's interest in an efficient judicial system."  *United States v. Cabral*, 979 F.3d 150, 156 (2d Cir. 2020) (quoting *Barker v. Wingo*, 407 U.S. 514, 519 (1972)).  The Supreme Court has identified four balancing factors to determine whether there has been a constitutional speedy trial violation: the "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *United States v. Moreno*, 789 F.3d 72, 78 (2d Cir. 2015).  "A long delay between indictment and trial is presumptively prejudicial to the defendant and triggers an inquiry into the other three *Barker* factors."  *United States v. Blanco*, 861 F.2d 773, 777 (2d Cir. 1988).

The three year and two month delay between the Court of Appeals' decision to deny leave to appeal on October 28, 2015 and the commencement of petitioner's trial on January 9,

---

[6] Respondent additionally notes that even were this claim cognizable, Petitioner cannot demonstrate prejudice due to delayed appeal because the delay benefited Petitioner at trial.  Dkt. No. 31 at 24.  Respondent notes that a previously-available witness was unable to testify at his subsequent trial and another witness could not recall identifying petitioner twelve years earlier. *Id.*

2019 is of sufficient length to trigger an inquiry into a possible Sixth Amendment violation. *See United States v. Black*, 918 F.3d 243, 255 (2d Cir. 2019) ("[T]he Supreme Court has noted that a post-accusation delay approaching one year may be considered presumptively prejudicial" sufficient to trigger review) (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992))); *Moreno*, 789 F.3d at 78 (27-month pre-arrest delay "was sufficient to trigger a Sixth Amendment analysis"); *see also* Dkt. No. 31 at 26 (Respondent acknowledging that the delay is of sufficient length to trigger an inquiry). As to the third factor, the defendant's assertion of his right to a speedy trial, Petitioner raised the claim that the proceedings violated his right to a speedy trial throughout the proceedings. *See, e.g.,* SR 0859 (Petitioner's counsel making a speedy trial motion at December 13, 2016 conference); SR 0866 (Petitioner's June 8, 2017 speedy trial motion); SR 0970 (Petitioner's October 4, 2018 speedy trial motion). However, this factor is of little weight in the analysis. *See Cabral*, 979 F.3d at 157, 157 n.3 (noting "it is uncontroverted that [defendant] asserted his right to a speedy trial in a timely fashion" and finding no error in district court's decision to not "accord significant weight to that factor.").

As to the remaining factors, reason for the delay and prejudice to the defendant, neither favors Petitioner nor supports a claim that the state court clearly erred in its application of federal law. In denying one of Petitioner's speedy trial motions on August 2, 2018, Justice Curtis Farber found that "while the period of time from Defendant's arrest has been lengthy, the vast majority of that delay is attributable to the Defendant, rather than the prosecution or the court." SR 0946. Shortly following remand, Petitioner caused a year-long delay in proceedings by filing his Article 78 petition against Justice Konviser, who at the time was presiding over Petitioner's criminal case and who determined, as a matter of law, that she could not make any rulings while the petition was pending and stayed the criminal action. SR 0946 (speedy trial decision); SR

0861 ("As a matter of law, there's nothing I can do with an Article 78 pending"). In the October 17, 2018 decision denying Petitioner's renewed speedy trial motion, the court again concluded that significant delay was attributable to Petitioner. The court noted that Petitioner provided the State with the reports of his two psychiatric experts on July 20, 2018, over a year after providing notice of intent to offer psychiatric evidence, SR 1145, and that following the provision of those reports, he failed to timely produce documents upon which the experts' reports were based. SR 1144–47. At the time of the October 17, 2018 decision, there remained outstanding document issues with respect to the defense's experts. SR 1149–50 (discussing missing documentation). Petitioner has provided no basis to second guess the state court's finding that much of the delay was attributable to him or its denial of his speedy trial motions on that basis. *See Cabral*, 979 F.3d at 158 ("[T]he Sixth Amendment is 'rarely violated' if the delay is 'attributable entirely to the defendant,'"); *United States v. Paul*, 326 F. Supp. 2d 382, 387 (E.D.N.Y. 2004) ("Where, as here, it is the defendant's own conduct that is largely responsible for any delay, the defendant's speedy trial argument is 'seriously undermined.'" (quoting *Blanco*, 861 F.2d at 778)). Moreover, Petitioner has not demonstrated that he was prejudiced by the delay; indeed, the fact that two witnesses who has previously made a positive identification of Petitioner could not identify Petitioner in the courtroom, suggests that the passage of time may have benefitted Petitioner and weakened the State's case.

Petitioner has provided no basis to conclude that the Appellate Division's denial of his speedy trial claim was in clear contravention of law as established by the Supreme Court. His claim is therefore denied.

III.    **Location of court officers in courtroom**

Petitioner claims that he was denied a fair trial because court officers were "surrounding petitioner, and standing behind him in witness seat, in front of jury." Dkt. No. 1 at 3. Petitioner

33

raised a similar claim on direct appeal, arguing that the presence of court officers violated Petitioner's due process right to a fair trial and the presumption of innocence.  SR 2051–56.  The Appellate Division, First Department denied the claim, noting that "the court providently exercised its discretion [to control its courtroom]" and "instructed the jury that it was 'standard procedure' to place a court officer behind a defendant while he testifies, and that the jurors should not 'assign any significance' to it." *Wells*, 226 N.Y.S.3d at 18.  The court concluded that "[a] court officer's presence behind defendant for that limited time would not 'telegraph[] to the jury that defendant was dangerous individual'" *Id.* (quoting *People v. Gamble*, 964 N.E.2d 372, 378 (N.Y. 2012)).

Petitioner has not demonstrated that the court's decision contradicted established federal law.  "[T]he presence of uniformed police officers in the courtroom is not by itself so inherently prejudicial as to deny a defendant of his constitutional right to a fair trial." *Encarnacion v. Walker*, 1998 WL 34002608, at *6 (N.D.N.Y. Aug. 21, 1998).  "Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence.  Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards." *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986).  The presence of court officers in the courtroom, especially where, at the defense's request, the court instructed jurors that their presence was "standard procedure" such that they should not "assign any significance to it," Trial Tr. at 1117,  did not violate any clearly established  constitutional rights.  *See Holbrook*, 475 U.S. at 569 ("Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.").  Moreover, any prejudice from the presence of officers was obviated

34

by Petitioner's testimony on direct examination that he was currently living on Rikers Island and had been detained for years at the time of trial. Trial Tr. 1117–1118. Petitioner's claim as to the presence of court officers is thus denied.

## IV.    Right to self-representation

Petitioner asserts that he was improperly denied his right to self-representation. Dkt. No. 1 at 3. Petitioner raised this claim on direct appeal, SR 2007–2018, and the Appellate Division denied it, determining that Petitioner "never made an unequivocal request to [represent himself], as the context reveals that he did not want to proceed pro se for all purposes." *Wells*, 226 N.Y.S.3d at 17. The Appellate Division also held, alternatively, that "[t]o the extent that he made an unequivocal request to proceed pro se, he abandoned his application." *Id.* The Appellate Division's decision is consistent with established federal law.

"A criminal defendant is entitled to proceed *pro se* if he 'knowingly, voluntarily, and unequivocally' waives his right to appointed counsel." *Wilson v. Walker*, 204 F.3d 33, 37 (2d Cir. 2000) (citing *Johnstone v. Kelly*, 808 F.2d 214, 216 (2d Cir. 1986)); *accord*, 422 U.S. at 835–36). However, "the right to self-representation does not attach unless it is asserted 'clearly and unequivocally.'" *United States v. Barnes*, 693 F.3d 261, 271 (2d Cir. 2012) (quoting *Wilson*, 204 F.3d at 37). The logic of that rule is apparent. "[U]nless the request is unambiguous and unequivocal, a convicted defendant could have a colorable Sixth Amendment appeal regardless of how the trial judge rules: if his request is denied, he will assert the denial of his right to self-representation; if it is granted, he will assert the denial of his right to counsel." *Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir. 1994). In addition, "the requirement of an unambiguous and unequivocal request inhibits any deliberate plot to manipulate the court by alternatively requesting, then waiving counsel." *Id.* at 100–01.

For an assertion of the right to self-representation to be clear and unequivocal, a defendant must assert that he seeks to represent himself in all aspects of the proceeding.  There is no right to "hybrid" representation, where a defendant represents himself for some aspects of trial but relies on counsel for others.  *See McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) ("*Faretta* does not require a trial judge to permit 'hybrid' representation" where counsel completes some aspects of trial, such as closing argument and questioning a witness on voir dire, but defendant otherwise represents himself); *id.* ("A defendant does not have a constitutional right to choreograph special appearances by counsel").  "[T]he federal constitution does not guarantee a right to 'hybrid representation.'  A defendant may either exercise his right to be represented by counsel or his right to represent himself but he has no constitutional right to do both simultaneously." *Pettus v. Greene*, 2007 WL 2292743, at *7 (E.D.N.Y. Aug. 9, 2007) (internal citations omitted).  In other words, "a criminal defendant has no constitutional or statutory right to represent himself as co-counsel with his own attorney." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989).

A defendant may also waive his right to self-representation "through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether." *Williams,* 44 F.3d at 100.  "Where there has been no clear denial of the request to proceed *pro se* 'and the question of self-representation [i]s left open for possible further discussion,' the defendant's 'failure to reassert his desire to proceed *pro se*' and his 'apparent cooperation with' his appointed counsel, who conducts the remaining pretrial and trial proceedings, 'constitute[s] a waiver of his previously asserted Sixth Amendment right' to proceed *pro se*." *Barnes*, 693 F.3d at 271–72 (quoting *Wilson,* 204 F.3d at 38–39).  However, "a defendant need not 'continually renew his request to represent himself even after it is conclusively denied by the trial court.  After a clear

36

denial of the request, a defendant need not make fruitless motions or forego cooperation with defense counsel in order to preserve the issue on appeal.'" *Wilson*, 204 F.3d at 37 (quoting *Brown v. Wainwright,* 665 F.2d 607, 612 (5th Cir. 1982) (en banc)). "The controlling principle . . . is that when a defendant in a criminal case has moved to represent himself and the court has not entered a 'clear' and 'conclusive[ ]' denial, it is incumbent on the defendant 'to reassert his desire to proceed *pro se*'; his failure to do so, especially where he proceeds to cooperate with his appointed counsel, 'constitute[s] a waiver of his previously asserted Sixth Amendment right' to proceed *pro se.*" *Barnes*, 693 F.3d at 272 (quoting *Wilson,* 204 F.3d at 37–38).

The Appellate Division's bases for holding that the court did not deprive Petitioner of his right to represent himself all have sound footing in federal law. The court found that Petitioner "never made an unequivocal request" to represent himself "as the context reveals that he did not want to proceed pro se for all purposes." *Wells*, 226 N.Y.S.3d at 17. During the *Faretta* colloquy on January 29, 2016, Petitioner described his lawyer as "co-counsel" and noted that, with respect to witnesses, "co-counsel can assist me with that because now, every, from what I understand, a lot of trial lawyers have the staff and some of them are good at speaking to jurors and picking jurors and some are good at cross-examining witnesses and handling trial and ending trial." SR 0812. He also stated that he might "need a little bit of assistance" and, after the court expressed doubt about his ability to proceed pro se, he stated that he would "know how to do" tasks at trial "with the help" and "advice" of his defense counsel. SR 0817. Petitioner never unequivocally requested to discharge his attorney and to assume the responsibility for representing himself through the trial. *See Williams*, 44 F.3d at 100 (defendant must demonstrate a "clear and unequivocal" application to "discharge counsel and act *pro se*"). His request was far narrower—to act as "co-counsel" with his defense attorney—and the court's denial of this

37

request did not implicate his constitutional rights. *See McKaskle*, 465 U.S. at 183 (trial court is not required to permit defendant to have "hybrid" representation). Nor was Petitioner's request for hybrid representation the only factor that inhibited the court from finding an unambiguous and unequivocal assertion of the right to self-representation. The trial court also opined that Petitioner primarily sought to represent himself so that he could "get another reversal," SR 0819, sharing the Second Circuit's concern that "unless the request is unambiguous and unequivocal, a convicted defendant could have a colorable Sixth Amendment appeal regardless of how the trial judge rules." *Williams*, 44 F.3d at 100. The court further expressed doubt as to Petitioner's ability to knowingly waive his right to counsel, noting that the court was "not getting straight answers" to its questions about trial procedure. SR 0817; *see U.S. v. Schmidt*, 105 F.3d 82, 88 (2d Cir. 1997) ("[T]he trial court must be persuaded that the waiver [of the right to counsel] is a rational one, and that defendant has the mental capacity to comprehend the consequences of relinquishing a constitutional right. . . . [and] possess[es] sufficient ability to understand the nature of the proceedings against her.").

In any event, the Appellate Division determined in the alternative that even if he had unequivocally requested to proceed *pro se*, Petitioner "abandoned his application." *Wells*, 226 N.Y.S.3d at 17. This too provided a proper basis for denying Petitioner's claim. On December 13, 2016, after the case was unstayed following final resolution of Petitioner's Article 78 petition, Petitioner inquired whether his request to proceed *pro se* was still pending. SR 0863. The court stated that she denied his initial application, but left the conversation open by inviting him to renew it, stating "If you want to make that application again, you can, and I'll hear you." *Id.* Petitioner consulted with his counsel and did not make a formal application. *Id.* Petitioner did not raise the issue again until the first day of trial, almost three years later. H. 492. In the

38

intervening years, Petitioner engaged in "apparent cooperation" with his appointed counsel, *Barnes*, 693 F.3d at 272, who filed motions and appeared in court on his behalf, *see, e.g.,* SR 0865 (motion to dismiss indictment filed by appointed counsel on June 8, 2017); SR 0931, 0948, 1101 (appearing with counsel at numerous appearances).

Furthermore, when Petitioner renewed his motion on January 9, 2019, it was neither timely nor unequivocal.  A criminal defendant "must make a timely . . . request to proceed *pro se*," *Williams*, 44 F.3d at 99, and where, as here, a motion to proceed *pro se* is "made 'just after the start of jury selection,'" it is deemed to be "made after the start of trial," *United States v. Walker*, 142 F.3d 103, 108 (2d Cir. 1998) (quoting *United States v. Stevens*, 83 F.3d 60, 66 (2d Cir. 1996)).  Once trial has begun, the right to self-representation is "sharply curtailed," *id.*, and the trial court "must balance the legitimate interests of the defendant in self-representation against the potential disruption of the proceedings," *Williams*, 44 F.3d at 99 n.1.  "A defendant has 'no right to "engag[e] in serious and obstructionist misconduct"' and 'a court may deny a defendant's request to proceed *pro se* if it finds that the request is manipulative or abusive in some other way." *Barnes*, 693 F.3d at 271 (quoting *Indiana v. Edwards*, 554 U.S. 164, 171 (2008), and *Wilson*, 204 F.3d at 38 n.4).  The state court did not unreasonably apply federal law in its balancing of these interests or in assessing Petitioner's motives for delay.  Moreover, the request was not unequivocal.  Petitioner again sought to engage in hybrid representation.  He "ask[ed] to cross-examine the arresting officers in this case" and affirmed upon further questioning that he wanted "Ms. Messina to do everything else[.]" H. 494.  The court did not violate clearly established law by denying Petitioner's request, nor did the Appellate Division in determining that this later motion for hybrid representation did not counteract Petitioner's earlier

39

waiver.  Accordingly, Petitioner's claim that he was unlawfully deprived of his right to self-representation is denied.

## V.    Sentencing

Petitioner claims that the trial court improperly failed to hold a hearing in connection with his adjudication as a persistent violent felony offender based on his 1990 and 1992 convictions.  Dkt. No. 1 at 3.  At sentencing, Petitioner argued that both convictions were unconstitutional and requested a hearing.  The court denied Petitioner's request and proceeded with sentencing.  Petitioner raised the argument again on direct appeal, and the Appellate Division denied the claim, stating that Petitioner had "not satisfied his burden of overcoming the presumptive constitutionality of his 1990 plea" and noting its prior determination that his 1992 conviction was constitutional.  *Wells*, 226 N.Y.S.3d at 19 (citing *People v. Wells*, 634 N.Y.S.2d 462 (1st Dep't 1991)).

The Appellate Division did not err in affirming the trial court's decision not to entertain a challenge to Petitioner's prior convictions.  In *Lackawanna County District Attorney v. Coss*, the Supreme Court held that "once a state conviction is no longer open to direct or collateral attack . . . the conviction may be regarded as conclusively valid."  532 U.S. 394, 403 (2001).  "If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained."  *Id.* at 404.  As a narrow exception to this rule, the Court held that a petitioner may challenge a predicate felony conviction in a habeas petition where "there was a failure to appoint counsel in violation of the Sixth Amendment."  *Id.* at 404. Both Petitioner's 1990 and 1992 convictions are "conclusively valid," as neither is open to direct or collateral attack at this juncture, over thirty years after judgment.  The Court's narrow exception does not apply here.  Petitioner makes no argument that he was denied counsel in

regard to his 1990 conviction.  *See* Dkt. No. 1 at 3; SR 1290–99 (arguing that his 1990 guilty

plea was invalid because he "pled guilty just for medical treatment" and he was never notified of

the charges against him).  Though he argues that his decision to proceed *pro se* at trial on his

1992 conviction was not knowing and voluntary, the Appellate Division denied that claim on

appeal and noted that "counsel, who acted as a legal advisor, was present during the entire trial."

*People v. Wells*, 634 N.Y.S.2d 462, 463 (1st Dep't 1995); SR 1300–01 (arguing that his decision

to proceed *pro se* was not knowing and voluntary).  Petitioner provides no basis to find that his

underlying convictions were invalid.

Moreover, Petitioner's argument that the trial court improperly denied him a hearing as to

the constitutionality of his prior convictions sounds only in state law.  *See People v. Elliot*, 612

N.Y.S.2d 173, 174 (2d Dep't 1994) (where a "defendant challenge[s] the constitutionality of a

prior conviction set forth in the People's predicate felony statement . . . the court should conduct

an inquiry into the matter and, if warranted, afford the defendant an opportunity to adduce

evidentiary support for his claim" (citing C.P.L. § 400.21)); C.P.L. § 400.21 (requiring court to

hold a hearing where defendant challenges the constitutionality of a predicate conviction).

There is no equivalent requirement under federal law.  "It is not the province of a federal habeas

court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502

U.S. 62, 67–68 (1991); *accord Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).  "[T]he 'refusal to hold

a hearing on his predicate felon status, raise[s] issues of New York criminal practice that may not

form the basis of federal habeas relief."  *Jackson v. Superintendent of Marcy Corr. Facility*, 2025

WL 2933282, at *6 (N.D.N.Y. July 30, 2025) (quoting *Scott v. Walker*, 2003 WL 23100888, at

*10 (E.D.N.Y. Dec. 30, 2003)); *cf. Englert v. Lowerre*, 115 F.4th 69, 89 (2d Cir. 2024) ("[A]ny

procedural error by the state court in denying a hearing [as to the provision of ineffective

assistance of counsel] under state law is not cognizable on federal habeas review"). Petitioner's claim that the state court improperly failed to hold a hearing as to the constitutionality of his underlying convictions is not cognizable on a federal habeas petition.

Petitioner's claim that his enhanced sentence as a violent felony offender is unconstitutional under *Erlinger v. United States*, 602 U.S. 821 (2024), also has no merit. The Supreme Court in *Erlinger* held that a defendant is entitled to have a jury determine whether the defendant's past offenses were committed on separate occasions for the purposes of sentencing under the Armed Career Criminal Act ("ACCA"). 602 U.S. at 835. *Erlinger* provides no relief to Petitioner. The Supreme Court in *Erlinger* held that the "fact-laden task" of evaluating the "times, locations, purpose, and character" of prior offenses to determine whether they were committed on separate occasions must be undertaken by the jury, *id.* at 834–35; it expressly did not revisit its decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), which permits a judge to find "the fact of a prior conviction" and "determine what crime, with what elements, the defendant was convicted of." 602 U.S. at 838 (quoting *Alleyne v. United States*, 570 U.S. 99, 111, n.1 (2013) and *Mathis v. United States*, 579 U.S. 500, 511–12 (2016)). *Erlinger* thus provides no support for Petitioner's argument that a jury was required to determine whether Petitioner should have been sentenced as a violent felony offender, which designation was premised solely on the "fact of [his] prior conviction[s]." *Id.*; *see United States v. Hicks*, 2025 WL 3640883, at *10 (W.D.N.Y. Dec. 16, 2025) (*Erlinger* held that "the matter of whether predicate offenses occurred on separate occasions in applying the ACCA is a question of fact that must be determined by a unanimous jury beyond a reasonable doubt. Thus, *Erlinger*'s holding is not directly applicable to [use of prior drug felony convictions to enhance sentence]") (internal citations omitted)).

Petitioner's claims as to his sentencing are thus denied.

## VI.    Prosecutorial Misconduct

Petitioner raises a variety of claims of prosecutorial misconduct.  He argues that the prosecution failed to provide material pursuant to the discovery requirements of *People v. Rosario*, 173 N.E.2d 881 (N.Y. 1961), Dkt. No. 1 at 2 ("Ground Four"); falsely testified regarding the Bronx District Attorney's Office's decision to defer prosecution, *id.*; suffered from a conflict of interest stemming from that false testimony, *id.* at 2 ("Ground Two"); withheld evidence about the destruction of DNA evidence until trial, *id.*; withheld grand jury testimony from a victim who stated he was "robbed by a big silver gun pointed to his head," *id.*; and, improperly used sealed evidence from the Bronx arrest at trial, *id.*  Construed broadly, Petitioner raises a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and a claim that prosecutorial misconduct deprived him of a fundamentally fair trial.

As a preliminary matter, two of Petitioner's claims are barred as unexhausted and procedurally defaulted.  To exhaust a claim, Petitioner must "fairly present" to the state court "the essential factual and legal premises of his federal constitutional claim." *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005).  In his *pro se* brief on direct appeal, Petitioner raised a claim that the State failed to turn over *Brady* material in reference to DNA evidence that could not be removed from storage, and raised a claim regarding the deferred prosecution form and ADA Fistel's testimony on October 17, 2008 regarding the deferred prosecution.  SR 2380.  Petitioner did not fairly raise, in either his *pro se* or counseled brief on direct appeal, any issues regarding grand jury testimony or the improper use of sealed evidence from his Bronx arrest.  These two claims are accordingly unexhausted.

Moreover, the unexhausted claims are procedurally defaulted, as each pertains to evidence introduced at trial and such record-based claims can only be raised on direct appeal.

43

*See* C.P.L. § 440.10(2)(c); *Gomez v. Brown*, 655 F. Supp. 2d 332, 359 (S.D.N.Y. 2009) ("Since Petitioner's ineffective assistance claim is record-based, he was required to raise it on direct appeal. . . . Because New York courts would refuse to address the unexhausted claim, it would be fruitless to require Petitioner to return to state court to exhaust it.  The claim is therefore deemed exhausted, but procedurally defaulted." (citations omitted)).  Petitioner's claim as to the improper introduction of evidence from his Bronx arrest is inherently record-based.  *See Sparrow v. Griffin*, 2017 WL 2912518, at *10 (N.D.N.Y. Apr. 6, 2017) ("A claim that evidence was improperly admitted is generally 'record-based,' and therefore, properly raised on direct appeal.").  His claim as to the grand jury testimony can either be construed as a claim that the State did not notify him that Goncalves would testify that the person who robbed him had a "big silver gun," Dkt. No. 1 at 2; *see* Trial Tr. at 755 (Goncalves testimony), 1145 (Petitioner expressing surprise regarding Goncalves's testimony), or as a claim that the State did not provide, prior to trial, the grand jury minutes from his 1990 conviction where the victim stated that the man who robbed her said he would blow her head off, *see* Trial Tr. at 1191–92 (prosecution cross-examining Petitioner regarding this testimony).  In either construction, Petitioner raises a record-based claim that could only be raised on direct appeal, but that he failed to raise.  Petitioner has not demonstrated cause for his failure to properly exhaust his claims on direct appeal or demonstrated that failure to address the merits will result in a miscarriage of justice.  *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).  Accordingly, these claims are procedurally defaulted.

Petitioner's claim that the State failed to provide *Rosario* material, Dkt. No. 1 at 2 (Ground Four), is not cognizable on a federal habeas claim.  "[F]ailure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of state law."  *Green v.*

*Artuz*, 990 F. Supp. 267, 274 (S.D.N.Y. 1998); *accord Johnson v. Filion*, 232 F. Supp. 2d 98, 100 (S.D.N.Y. 2002); *see also Miles v. Conway*, 739 F. Supp. 2d 324, 340 (W.D.N.Y. 2010) ("Federal habeas courts have consistently held that Rosario claims are not subject to review because they arise exclusively under state law."). Petitioner's *Rosario* claim is therefore denied.

As to Petitioner's remaining claims of prosecutorial misconduct, the Appellate Division did not contradict clearly established federal law by finding them "unavailing." *Wells*, 226 N.Y.S.3d 19. Petitioner raises a claim under *Brady* that the State improperly failed to provide evidence that his original DNA sample was destroyed by Hurricane Sandy. To establish a *Brady* violation, Petitioner must establish three elements: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Stickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Setting aside the first element and assuming evidence that his original DNA sample was destroyed is favorable to him, Petitioner has not demonstrated either that the State suppressed this evidence or that any late provision of the evidence caused any prejudice. Petitioner's counsel was informed that the materials had been destroyed and received the data relating to those lost materials with sufficient time for them to be examined by the defense DNA expert. Trial Tr. 416–17. Moreover, when Petitioner raised the issue regarding the lost sample to the trial court in the middle of trial, *id.* at 415, his counsel stated to the court that while the original material may be missing, "it wouldn't have made a difference to the actual determinativeness, reliability of what may be put in evidence in this case," *id.* at 417. Furthermore, defense counsel elicited from the DNA expert that the DNA samples were originally tested in 2007 and 2008, and had not been re-tested at any time closer to trial, but that,

if preserved correctly, they could have been retested.  Trial Tr. 979–80.  The jury was therefore aware that the DNA samples were tested close in time to the incidents and were not re-tested in preparation for trial.  Petitioner has failed to establish any prejudice resulting from the destruction of his DNA sample or the late provision of that information to his counsel, even assuming such information was not timely disclosed.  The Appellate Division's denial of his *Brady* claim therefore comports with federal law.

Petitioner's claims regarding the deferred prosecution decision and form are similarly unavailing.  Petitioner has provided no evidence that the decision by the Bronx District Attorney's Office to defer prosecution on the possession of stolen property charge so as to permit the Manhattan District Attorney's Office to pursue robbery charges was improper or in any way constituted misconduct.  *See* SR 0282–85 (discussion of charging decision); *see Dantzig v. Cnty. of Westchester*, 2021 WL 1030655, at *7 (S.D.N.Y. Mar. 16, 2021) ("The decision whether to charge, and what to charge, are solely within the discretion of the prosecution.").  Nor has he demonstrated that ADA Fistel's testimony regarding that decision on October 17, 2008 was false or relied on forged documents.  In support of his claim, Petitioner solely offers that prior to this testimony, he had received two copies of the deferred prosecution form as *Rosario* material, one of which was signed and one of which was unsigned.  SR 0277–78 (claiming that the form "was manufactured" and noting that the form he received was unsigned).  Fistel explained the apparent discrepancy during his testimony, stating that he had received a copy of the signed form close to the date of Petitioner's arrest and subsequently asked the Bronx District Attorney's Office for a copy of the form, which they faxed him on June 27, 2008 as an unsigned copy.  SR 0292–94.  Petitioner has pointed to nothing untoward in this series of events.  It thus follows that there is similarly nothing improper with ADA Groves prosecuting Petitioner in 2019 and being present

46

for Fistel's testimony in 2008, as Petitioner's claim that this created a conflict of interest depended on Fistel's testimony being false. Even were these allegations to suggest improper behavior, Petitioner's allegations of misconduct fall far short of demonstrating that the State's conduct caused "substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002). His claim of prosecutorial misconduct is therefore denied.

## VII.    Improper detention on Rikers

Petitioner challenges his detention at Rikers Island after the reversal of his conviction through the end of his trial as a violation of his Fourth Amendment rights. Dkt. No. 1 at 2. Petitioner raised a similar claim in his *pro se* brief on direct appeal, arguing that he was illegally arrested after his release from DOCCS custody and illegally detained at Rikers Island pursuant to an "Unauthorized Take Out and Return Order." SR 2384. He stated that the "Arrest, Search & Seizure is illegal." *Id.* He additionally argued that the judge improperly denied him bail pending his 2019 trial, SR 2386, and raised issues with paperwork upon his return to DOCCS custody. *Id.* at 2386. Respondent argues that Petitioner's claims under the Fourth Amendment are not cognizable because he failed to raise the claim in federal constitutional terms on direct appeal and any claim that he was illegally detained prior to trial is mooted by his conviction or otherwise barred by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465, 494 (1976).

Under the AEDPA, a petitioner must exhaust all available state court remedies for each claim prior to seeking federal habeas review. 28 U.S.C. § 2254(b). Exhaustion requires both that the factual and legal basis for the claim "be fairly presented to the highest available state court" and be "articulated in federal constitutional terms sufficient to alert the state court to the federal nature of the claim." *Colon v. Connell*, 2009 WL 2002036, at *6 (S.D.N.Y. July 9, 2009) (citing *Daye v. Att'y Gen. of the State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc)).

47

Articulating a claim in constitutional terms does not require a habeas petitioner to "cit[e] chapter and verse of the Constitution" but instead can be accomplished through "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye*, 696 F.2d at 194.

Petitioner's assertion on direct appeal that the "[a]rrest, [s]earch & [s]eizure" following his release from DOCCS custody was "illegal," SR 2384, was sufficient to "call to mind" the protections of the Fourth Amendment and "adequately put the state courts on notice of the constitutional thrust of his claim," *Daye*, 696 F.2d at 194. His claim was therefore fairly presented to the state court and is exhausted. However, his claim that his pretrial detention violated the Fourth Amendment fails because it is mooted by his subsequent conviction. *See Murphy v. Hunt*, 455 U.S. 478, 481–82 (1982) ("[Appellant's] claim to *pretrial* bail was moot once he was convicted. The question was no longer live because even a favorable decision on it would not have entitled [him] to bail." (emphasis in original)). Petitioner previously raised a challenge to his custody on Rikers Island in this District pursuant to 28 U.S.C. § 2241, alleging a Fourth Amendment violation based on the same facts of arrest and detention following the reversal of his 2011 conviction. *Wells v. Annucci*, 2019 WL 2209226, at *1–2 (S.D.N.Y. May 21, 2019). That petition was dismissed as moot due to his subsequent conviction and placement in state custody. *Id.* at *2. Then, as now, Petitioner cannot "seek[] release from his current custody based on his *previously* having been held in pretrial detention at Rikers Island." *Id.* Petitioner also does not allege that his arrest or pretrial detention rendered his conviction unconstitutional. *See Howard v. Garvin*, 844 F. Supp. 173, 175 (S.D.N.Y. 1994) ("Petitioner's

challenge to the arrest at the scene of the crime ignores the fact that petitioner's conviction, not the original arrest, is the basis of petitioner's confinement. Claimed deficiencies in preliminary steps which do not affect the validity of the conviction cannot support vacatur of that conviction."). To the extent Petitioner seeks habeas relief based on errors in his DOCCS paperwork, such errors pertain to state law and are not cognizable on habeas review. *See Estelle*, 502 U.S. at 67–68. Petitioner's claims pertaining to his arrest and detention are thus denied.

## VIII. Improper Cross-Examination

Petitioner next argues that the trial court erroneously permitted the State to cross-examine him regarding his 1992 conviction for first-degree robbery. Dkt. No. 1. As articulated in his direct appeal, SR 2018–19, Petitioner argues that the court erred in modifying its *Sandoval* ruling in response to Petitioner's testimony that he "never had a gun in New York City in [his] life" and did not "like guns," Trial Tr. at 1145. Petitioner, through counsel, argued that his 1992 conviction "merely related to the testimony" but did not "in fact *refute[]* the testimony given," because the 1992 conviction did not include actual possession of a firearm as an element, but only the display of what appeared to be a firearm. SR 2018–19 (quoting *People v. Fardan*, 628 N.E.2d 41, 45 (N.Y. 1993)). The Appellate Division denied the claim as waived because Wells "repeatedly stat[ed] that he wanted to tell the jury about the facts underlying his claims and admit[ed] that he had intentionally opened the door." *Wells*, 226 N.Y.S.3d at 17. The court also denied the claim on the merits, stating that Petitioner's testimony "create[d] the misleading impression that he was innocent of any wrongdoing and had been victimized by the criminal justice system" and portrayed himself "as a person who did not like guns and had never possessed a gun." *Id.* at 18.

The Appellate Division's holding that the claim was barred due to affirmative waiver constitutes an adequate and independent state ground for denying this claim that precludes

49

federal habeas review.  *See Rosa v. Herbert*, 277 F. Supp. 2d 342, 351 (S.D.N.Y. 2003).  "A 'firmly established and regularly followed' state procedural rule generally is considered an adequate and independent state ground, sufficient 'to foreclose review of a federal claim.'"  *Id.* (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).  A federal habeas court may only review the merits of a procedurally-barred claim if the petitioner makes one of two showings: (1) cause for his default and actual prejudice, *see Coleman v. Thompson,* 501 U.S. 722, 750 (1991), or (2) federal court's refusal to consider the merits of his claim will result in a fundamental miscarriage of justice, because he is "actually innocent" of the crimes of which he was convicted, *Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir. 2001).  "Cause can be established by showing that the default was the result of 'some objective factor external to the defense.'"  *Martinez v. Ercole*, 2010 WL 1779351, at *5 (S.D.N.Y. Apr. 21, 2010) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1986)).

Courts in this Circuit have repeatedly recognized affirmative waiver of a claim as a "firmly established and regularly followed" procedural rule precluding further review.  *See, e.g., Morales v. Collado*, 2023 WL 1993334, at *2 (S.D.N.Y. Feb. 14, 2023) (finding that petitioner affirmatively waived use of impeachment evidence was an adequate and independent state ground precluding review); *Dukes v. Graham*, 2020 WL 10897194, at *8 (W.D.N.Y. Apr. 28, 2020) ("Courts in this Circuit have found that a petitioner's waiver of a claim precluding further review constitutes an adequate and independent state ground."); *Morales v. Woughter*, 2010 WL 2399992, at *4 (E.D.N.Y. June 10, 2010) (affirmative waiver of right to appeal constitutes an independent and adequate state ground).

The Appellate Division's finding of waiver is supported by the record.  During the *Sandoval* hearing, Petitioner stated, in regard to his 1990 and 1992 convictions, that "it would probably benefit me more to mention them and show what actually happened with the jury."  H.

50

350. When discussing the extent to which Petitioner opened the door, he again expressed a desire to share the details with the jury and the trial court assured him that can talk about "d[oing] thirteen years for a crime [he] didn't commit, and [how] that destroyed [him] mentally" if he wishes. Tr. at 1168. And, just prior to summations, Petitioner acknowledged that he had opened the door in order to discuss his prior history, stating "[s]ince you cleared the way for the open door and said that if you open this door, that I would be subjected to my prior history, and I was of understanding that it would probably be prejudicial to me, but I decided to go ahead and open the door." Tr. 1488. The record therefore confirms the Appellate Division's finding that Petitioner affirmatively waived any claim that the state's cross examination was improper. *See Martinez*, 2010 WL 1779351, at *5 (finding claim procedurally barred where review of the record supports Appellate Division's conclusion that defense counsel failed to adequately preserve the issue). Petitioner has not established cause so as to waive the procedural default, nor has he demonstrated that this Court's refusal to consider the merits of his claim will result in a fundamental miscarriage of justice because he is "actually innocent" of the crimes of conviction. *Id.* Petitioner repeatedly expressed his desire to explain the facts of his prior convictions and explain the sympathies of his case to the jury, and followed through with that aim despite the advice and warning of the court and his counsel.

As there exist adequate and independent state grounds upon which Petitioner's claim fails, the Court is precluded from reviewing his claim and need not address the merits.

## IX.   Prosecutor's Improper Summation

Petitioner additionally argues that he was denied his constitutional right to a fair trial due to the State's so-called *Molineux* error in its summation, which comingled the evidence of the three robberies and argued that the jury could consider each as evidence of Petitioner's modus operandi. Dkt. No. 1 at 3. "New York's *Molineux* doctrine 'forbids an inference of guilt from

51

evidence probative of no more than predisposition to a kind of behavior.'" *Rivers v. Smith*, 2016 WL 7031557, at * (E.D.N.Y. Dec. 1, 2016) (quoting *People v. Cortez*, 4 N.E.3d 952, 958 (N.Y. 2014)); *see People v. Molineux*, 61 N.E. 286 (N.Y. 1901).  In particular, Petitioner challenges the State's statement that "[t]he defendant's MO was as unique as his DNA, his fingerprints, and his signature."  Trial Tr. 1604.  Petitioner raised this argument in his counseled brief on direct appeal, *see* SR 2031–38, 2024–43, but the Appellate Division found that his "challenges to the prosecutor's summation are unpreserved" for appeal and, alternatively, found "no basis for reversal."  *Wells*, 226 N.Y.S.3d at 18.

As previously explained, where there exists an adequate and independent state ground for denying a claim, the federal court is precluded from reviewing the merits of that claim on a habeas petition.  "New York's contemporaneous-objection rule serves as 'a firmly established and regularly followed New York procedural rule' that provides independent and adequate grounds for barring federal habeas relief."  *Carew v. Morton*, 150 F.4th 150, 160 (2d Cir. 2025) (citing *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011)).  The rule requires that "a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling 'at the time of such ruling or at any subsequent time when the [trial] court had an opportunity of effectively changing the same.'"  *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting C.P.L. § 470.05(2)).  In other words, "any matter which a party wishes the appellate court to decide [must] have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error."  *People v. Luperon*, 647 N.E.2d 1243, 1246–47 (N.Y. 1995).  "[W]hen 'a state appellate court refuses to review the merits of a criminal defendant's claim of constitutional error because of his failure to comply with . . . a "contemporaneous objection" rule,' a federal court may review the merits of

52

such a claim where the state court 'unevenly' applies its contemporaneous-objection rule."

*Silverman v. Edwards*, 69 Fed. App'x 489, 491 (2d Cir. 2003) (summary order) (first quoting

*Peterson v. Scully*, 896 F.2d 661, 663 (2d Cir. 1990); then quoting *Williams v. Lane*, 826 F.2d

654, 659 (7th Cir. 1987)).

Here, defense counsel made a general objection upon the close of summation, Trial Tr. at

1606, and specifically objected to the State's modus operandi argument shortly after the

summation ended, as follows:

> One other thing, for the record, the People's summation, I am objecting after the
> fact, because it was kind of how they closed, they made a comparison about all
> three events in terms of the MO, while they were unique and distinguishable, I am
> concerned that the prejudice now, though there's less proof on one event as opposed
> to the others, they are now going to conclude that because of the similarity and
> MO's, they should find him guilty on everything.

Trial Tr. at 1612–1613.  The court overruled the objection, stating "I think you and I have done

everything possible to emphasize, to the point of beating them over the head, with the

admonition they should consider each count separately."  *Id.* at 1613.  Though defense counsel

did not preserve the other *Molineux* issues raised on direct appeal, *see* SR 2035–36 (raising

claims regarding prosecution's statement "five days, three car-jackings, one perpetrator" and

noting that the detective was investigating a pattern of robberies); SR 2039 (arguing that state

improperly made a propensity argument when examining defense expert), defense counsel did,

through her objection, preserve the argument regarding the State's "MO" statement in

summation.  *See* SR 2699 (State brief to Appellate Division, acknowledging that defense counsel

preserved argument regarding "MO" statement); *cf. Silva v. Keyser*, 271 F. Supp. 3d 527, 543

(S.D.N.Y. 2017) ("[P]etitioner's counsel could have objected during the prosecutor's summation

or immediately after the conclusion of the summation.  That would have provided the trial court

the opportunity to consider the objection and give any curative instructions.").  Moreover,

"[r]egardless of whether defendant's objection to the [summation] was sufficiently explicit, the trial court, in response to defendant's protest, 'expressly decided the question raised on appeal,' thus preserving the issue for review." *People v. Smith*, 5 N.E.3d 972, 973 (N.Y. 2013) (quoting C.P.L. § 470.05(2)). The Appellate Division's finding that Petitioner failed to preserve his claim was an inconsistent application of the contemporaneous objection rule, and this Court may proceed to the merits. *See Watson v. Superintendent of Greene Corr. Facility*, 2023 WL 6119709, at *19 (E.D.N.Y. Sept. 18, 2023) (reviewing merits of claim where Appellate Division inconsistently applied contemporaneous objection rule by finding argument unpreserved despite repeated objections from defense counsel).

Regardless of its preservation ruling, the Appellate Division did not contradict established federal law in alternatively denying the claim of prosecutorial misconduct. *See Wells*, 226 N.Y.S.3d at 18. To demonstrate that the State's comments deprived Petitioner of a fair trial, Petitioner must show that "the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "Inquiry into the fundamental fairness of a trial requires an examination of the effect of any misconduct within the context of the entire proceedings." *Taus v. Senkowski*, 293 F. Supp. 2d 238, 251 (E.D.N.Y. 2003). The State's statement that his "MO was as unique as his DNA, his fingerprints, and his signature," Tr. 1604, did not create any fundamental fairness. The State reiterated that "the evidence presented to you has independently proved the defendant's guilt beyond a reasonable doubt as to each individual robbery." Tr. 1604. Defense counsel also emphasized in her summation that the alleged crimes must be considered separately, as though the jurors were "siting at three separate trials," Tr. at 1497, and noted that there is no overlapping evidence, such

that "very possibly three separate people could have done these things," *id.* 1498. At the very beginning of trial, during jury selection, the court informed the jury that they would "have to consider each charge separately," H. 600, and in its final charge, the court told the jury "because you have to consider each charge separately, and there are six charges, you could find the defendant guilty of six charges, or find the defendant guilty of some charges and not guilty of some charges." Tr. 1650–51. As the court noted in overruling defense counsel's objection, the jury had been repeatedly "admoni[shed] they should consider each count separately." Trial Tr. at 1613. The jury plainly understood the court's instruction to consider each count separately; it acquitted Petitioner of the charges related to the Welikson robbery, notwithstanding the statement about Petitioner's MO. Trial Tr. 1693. Petitioner has not demonstrated that the court misapplied federal law in concluding that the State's comments did not undermine the fundamental fairness of the trial.

## X.      The Testimony of the DNA Evidence Expert Witness

Lastly, Petitioner argues that the testimony of the State's DNA expert witness violated the Confrontation Clause of the Sixth Amendment. Dkt. Nos. 9, 10.[7] Petitioner raised this claim in his direct appeal and the Appellate Division denied it on the merits, reasoning that "[a] defendant's right to confrontation is not violated simply because an expert DNA analyst refers to data gathered by nontestifying technicians." *Wells* , 226 N.Y.S.3d at 18. The Appellate Division noted that at Petitioner's trial "the analyst testified about her review of the data and her independent conclusions based thereon" and there was thus "no Confrontation Clause violation because the expert analyst's testimony demonstrated her own 'independent analysis' of the data

---

[7] Petitioner made this argument in letters filed subsequent to his petition. Dkt. Nos. 9, 10. The Court directed Respondent to "address why the Petition should not be construed to include the claim identified in Petitioner's letter." Dkt. No. 11. Respondent construed Petitioner's letters as to supplement his petition. Dkt. No. 31 at 89 n.18.

to make a comparison, and the analysis was not merely 'a conduit for the conclusions of others.'" *Id.* (quoting *People v. John*, 52 N.E.3d 1114, 1128 (N.Y. 2016)).

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant "the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI, and the Supreme Court has held that this right applies to out-of-court testimonial statements offered for the "truth of the matter asserted," *Smith v. Arizona*, 602 U.S. 779, 783 (2024) (quoting *Crawford v. Washington*, 541 U.S. 36, 60 n.9 (2004)). "'[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial'—that is, in light of all the relevant circumstances, viewed objectively, the statement was made or procured with a primary purpose of 'creat[ing] an out-of-court substitute for trial testimony.'" *Washington v. Griffin*, 876 F.3d 395, 404 (2d Cir. 2017) (quoting *Ohio v. Clark*, 576 U.S. 237, 245 (2015)).

The Supreme Court has "made clear that the Confrontation Clause applies to forensic reports." *Smith*, 602 U.S. at 785. In *Melendez-Diaz v. Massachusetts*, the Court held that "the sworn, notarized certificates of lab analysts, each reporting on the weight of the bags and affirming that the contents had been examined and determined, in fact, to be cocaine, were testimonial, and could not be admitted at trial absent the defendant's opportunity to cross-examine the declarants." *Washington*, 876 F.3d at 404 (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 308 (2009)). These certificates were affidavits that served "to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance[s]," and the Court found it could "safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose . . . was reprinted on the affidavits themselves." *Melendez-Diaz*, 557 U.S. at 311. The Court similarly found in *Bullcoming v. New Mexico* that the admission into evidence of a lab report with a signed certification regarding the

56

defendant's blood-alcohol level was improper without an opportunity to cross-examine to analyst.  564 U.S. 647, 664–65 (2011).  The Court addressed whether "surrogate testimony," wherein another qualified analyst from the same lab testifies regarding the certification, could satisfy the Confrontation Clause and held that it could not.  *Id.* at 661.  Such testimony "'could not convey what [the certifying analyst] knew or observed' about the 'particular test and testing process he employed.'  Nor could that 'testimony expose any lapses or lies on the certifying analyst's part,' or offer any insight into whether his leave-without-pay was the result of misconduct."  *Smith*, 602 U.S. at 786 (quoting *Bullcoming*, 564 U.S. at 661–662).

In *Williams v. Illinois*, 567 U.S. 50 (2012), the Supreme Court addressed the applicability of the Confrontation Clause to testimony from an analyst whose conclusion as to DNA evidence was based in part on another analyst's findings.  The DNA expert in *Williams* testified that the DNA profile of the defendant, which had been created in the lab where she worked, matched the DNA profile generated from swabs taken from the rape victim.  The swabs from the victim were not analyzed by the testifying expert or in the lab where she worked, but instead were sent to and received from an outside lab, Cellmark.  567 U.S. at 73.  Even though no analyst from Cellmark testified at Williams's trial, the Court held that the admission of the DNA expert's testimony did not violate the Confrontation Clause.  *Id.* at 79.  However, the Court, issuing a plurality opinion, two concurrences, and a dissent, "came to no clear consensus as to what constituted a testimonial statement in this context."  *Washington*, 876 F.3d at 406 (quoting *United States v. James*, 712 F.3d 79, 91 (2d Cir. 2013)).

In *Smith*, the Court rejected one of the rationales relied upon by the plurality in *Williams*: that the statements in the Cellmark report did not violate the Confrontation Clause because they were not entered into evidence for the truth of the matter asserted.  602 U.S. at 795.  The Court

57

reasoned that "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* Evaluating the issue from the factfinder's perspective, the court noted that "[t]he jury cannot decide whether the expert's opinion is credible without evaluating the truth of the factual assertions on which it is based." *Id.* at 796. There is, therefore, a "Confrontation Clause problem" because "the defendant has no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work." *Id.* Permitting a "surrogate analyst [to] testify to all of the same substance—that is, someone else's substance—as long as he bases an 'independent opinion' on that material . . . even if, as here, the proffered opinion merely replicates, rather than somehow builds on, the testing analyst's conclusions" would mean that "no defendant would have a right to cross-examine the testing analyst about what she did and how she did it and whether her results should be trusted." *Id.* at 798–99. Such a result would, "[i]n short, . . . end run all [the Court] [has] held the Confrontation Clause to require." *Id.* at 799. The Court did not resolve, however, whether the statements were testimonial—a "question [] independent of" whether the statement is offered for its truth and necessary for determining whether there was a Confrontation Clause violation. *Id.* at 800. In a portion of the opinion joined only by a plurality of justices, the Court noted that the underlying statements would not be testimonial if their primary purpose was "to comply with laboratory accreditation requirements or to facilitate internal review and quality control" or "written simply as reminders to self." *Id.* at 802.

Applying *Smith*, the only Circuit Court to address the issue has held that an expert witness's testimony regarding DNA testing performed by a non-testifying analyst raises a Confrontation Clause question. In *United States v. Seward*, 135 F.4th 161, 168 (4th Cir. 2025),

the Fourth Circuit found that where a DNA expert testified to procedures typically followed in the lab for testing DNA samples and testified as to her conclusions regarding DNA samples, "without having tested the samples herself," her testimony regarding the underlying DNA testing "was offered for the truth of the matter asserted and so implicates the Confrontation Clause." *Id.* In view of the expert's testimony about the "lab's typical procedure for analyzing swabs and then about her analysis of the swabs that had been collected," "[t]he obvious implication—indeed, the only way the testimony makes sense—is that the DNA expert was representing that the non-testifying analyst who ran the underlying tests in fact followed the procedures the DNA expert had just described." *Id.* at 168. The court determined that after *Smith*, its prior holding that "a DNA expert could testify to his own independent conclusions, even though the analyst who did the underlying lab work would not be testifying" was "no longer tenable" as its precedent "'is impossible to reconcile with' that decision." *Id.* at 169 (citing *United States v. Summers*, 666 F.3d 192, 201 (4th Cir. 2011) and quoting *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023)). The court, however, ultimately declined to decide whether the underlying statements were testimonial and determined instead that any Confrontation Clause violation, if present, was harmless. *Id.* at 169–70.

Here, the state's DNA expert, Kecia Harris, testified as that in her opinion, the DNA profiles generated from evidence collected from Goncalves's car matched Petitioner's DNA profile. Harris testified that she reviewed all of the data generated from the DNA testing, Trial Tr. at 927, personally determined the DNA profiles based on the data, and wrote the report setting forth her conclusion that Petitioner is the source of the DNA found on the evidence, *id.* at 934–935, 949–50, 985. However, she did not personally examine the evidence when it arrived at the lab to ensure that it was packaged and opened correctly, *id.* at 958–59, nor perform the first

59

three stages of DNA testing: extraction, quantification, and amplification, *id.* at 917, 953–56.

She testified that the lab has specific protocols that analysts follow to extract DNA from

evidence and develop the raw data, but she did not personally supervise or otherwise witness any

step in this process.  *Id.* at 953–956.  In sum, this case presents the type of testimony addressed

in *Seward*.  The expert witness testified as to her analysis of the raw data generated from a non-

testifying analyst, and that data only supports Harris's opinion if accurate.  As in *Smith*, the

"truth is everything when it comes to the kind of basis testimony presented here."  602 U.S. at

795.

The Appellate Division's statement that Harris's testimony did not violate the

Confrontation Clause because "a defendant's right to confrontation is not violated simply

because an expert DNA analyst refers to data gathered by nontestifying technicians," *Wells*, 226

N.Y.S.3d at 18, thus is not sufficient to address Petitioner's claim.  To the extent that the court is

to be understood as holding that a testifying DNA analyst's reference to data gathered by a

nontestifying technician does not raise a Sixth Amendment issue because the reference is not

offered for its truth, that holding would be contrary to clearly established federal law.[8]  That a

testifying analyst came to an independent conclusion based on the data generated by a different

analyst is not sufficient to satisfy the Sixth Amendment.  *See Smith*, 602 U.S. at 798–99

(rejecting "independent opinion" rationale).  As the Supreme Court stated, such reasoning would

---

[8] *Smith v. Arizona* was decided on June 21, 2024, before the Appellate Division's January 7, 2025 decision in *Wells*.  "When judging whether a state court decision was contrary to, or an unreasonable application of, Supreme Court precedent, we measure the last state-court adjudication of the petitioner's claim on the merits 'against [the Supreme] Court's precedents as of the time the state court render[ed] its decision." *Garlick v. Lee*, 1 F.4th 122, 128 (2d Cir. 2021) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011)).  The Appellate Division's decision was the last state-court adjudication on the merits, and thus the law as established in *Smith v. Arizona* is applicable here.  *See id.* at 133 (noting that "First Department's decision[] . . . was the last state-court adjudication of Garlick's claim on the merits").

permit "every testimonial lab report [to] come into evidence through any trained surrogate, however remote from the case[,] [a]nd no defendant would have a right to cross-examine the testing analyst about what she did and how she did it and whether her results should be trusted." *Smith*, 602 U.S. at 799.  The concerns animating the Court's decision in *Smith* are equally present here: the jury is asked to rely on a non-percipient witness's testimony regarding the precautions the analyst should have taken and whether the DNA testing results should be trusted. *See Smith*, 602 U.S. at 800 (noting that expert witness "effectively became [non-testifying analyst's] mouthpiece," testifying "to the precautions (she said) she took, the standards (she said) she followed, the tests (she said) she performed, and the results (she said) she obtained.").

The question that remains then is whether the DNA profiles were testimonial statements. In describing the contours of this category, the Supreme Court has focused on the primary purpose or expected use of the statement.  *See Smith*, 602 U.S. at 784–85 (describing prior precedents); *Davis v. Washington*, 547 U.S. 813, 822 (2006) (testimonial statements include those taken by police officers during interrogation where the purpose "is to establish or prove past events potentially relevant to later criminal prosecution"); *Michigan v. Bryant*, 562 U.S. 344, 348 (2011) (determining testimonial nature based on whether statement was "procured with a primary purpose of creating an out-of-court substitute for trial testimony."); *Melendez-Diaz*, 557 U.S. at 311 (certificates of the results of forensic analysis were testimonial because they were created "under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial."); *Bullcoming*, 564 U.S. at 652 (describing a "testimonial certification" as one "made for the purpose of proving a particular fact").  The DNA profiles and data at issue here were generated by an OCME analyst to assist in criminal prosecution, which circumstances "would lead an objective witness reasonably to

61

believe that the statement[s] would be available for use at a later trial." *Melendez-Diaz*, 557 U.S. at 311. The DNA profiles were further generated "for the purpose of proving a particular fact," *Bullcoming*, 564 U.S. at 652, namely that Petitioner's DNA was present at the scene of the robberies. However, the Court has explicitly not addressed whether statements or data underlying an expert report are testimonial, *see Smith*, 602 U.S. at 801 (this "issue is not now fit for our resolution"), and only a plurality of the Court adopted the "primary purpose" test for testimonial statements, *id.* at 801–802. "Because none of [the Supreme Court's] cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from th[at] Court." *Woods v. Donald*, 575 U.S. 312, 317 (2015) (quoting *Lopez v. Smith*, 574 U.S. 1, 4 (2014)). Though the Appellate Division's reliance on Harris's "independent conclusion" was contrary to established federal law, its ultimate decision that her testimony did not violate the Confrontation Clause is not contrary to the Supreme Court's articulation of the law. *See Williams*, 529 U.S. at 381 (If the Supreme Court "has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar.").

In any event, even if the admission of Harris's testimony violated the Confrontation Clause, that would not end the inquiry. "[A] reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *United States v. Gonzalez*, 144 F.4th 396, 407 (2d Cir. 2025) (quoting *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006)). Petitioner bears the burden of showing that the error was not harmless. *Hernandez v. McIntosh*, 146 F.4th 142, 163 (2d Cir. 2025). He must establish that the error at trial "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). Federal courts apply "the standard set forth in *Brecht*, whether or not the state appellate

court recognized the error and reviewed it for harmlessness." *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (internal citation omitted)); *accord Jefferson v. LaClair*, 4 F. Supp. 3d 462, 478 (E.D.N.Y. 2014). "'[T]he strength of the prosecution's case . . . is probably the single most critical factor' in harmless-error analysis." *Id.* (quoting *United States v. Lee*, 549 F.3d 84, 90 (2d Cir. 2008)).

While a jury may regard DNA evidence as especially probative, erroneous admission of DNA evidence can constitute harmless error. *See Ellis v. Phillips*, 2005 WL 1637826, at *25 (S.D.N.Y. July 13, 2005) (even if admission of DNA evidence was in error, such error was harmless where two witnesses identified defendant at trial, one of whom also identified defendant in line ups, and the defendant was arrested at the scene after police pursuit); *Watkins v. Artus*, 2010 WL 5060861, at *15 (S.D.N.Y. July 22, 2010) (same where petitioner was arrested nearby location of burglary wearing items that matched the exact description of what had been stolen); *United States v. Wilbern*, 2022 WL 10225144, at *3 (2d Cir. 2022) (summary order) (same where former co-worker and two ex-girlfriends identified defendant in surveillance photos and close friend stated that defendant resembled man in surveillance photos, and where circumstantial evidence supported the conclusion that defendant committed robbery). Here, outside of the DNA evidence, the State presented overwhelming evidence of Petitioner's guilt. That evidence came in the form of the lineup identification, the handprint comparison, and Petitioner's written statements following his arrest tying Petitioner to the robbery of Goncalves's car. Even if the admission of DNA evidence was in error, Petitioner has not established that the error had a "substantial and injurious" effect on the jury's verdict.

## CONCLUSION

For the foregoing reasons, the Petition is DENIED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and

therefore *in forma pauperis* status is denied for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

         SO ORDERED.

Dated: April 28, 2026
      New York, New York

                                           LEWIS J. LIMAN
                                United States District Judge